JAMES G. MARTIN, Governor of the State of North Carolina, and GRACE J. ROHRER, Secretary of Administration v. LACY H. THORNBURG, as Attorney General and as a Member of the Council of State; ROBERT B. JORDAN, III, Lieutenant Governor of the State of North Carolina; THAD EURE, Secretary of State; EDWARD RENFROW, State Auditor; HARLAN E. BOYLES, State Treasurer; DR. A. CRAIG PHILLIPS, Superintendent of Public Instruction; JAMES A. GRAHAM, Commissioner of Agriculture; JOHN C. BROOKS, Commissioner of Labor; JAMES E. LONG, Commissioner of Insurance, as Members of the Council of State; and LOIS CARLYLE BERRY

No. 729PA86

(Filed 3 September 1987)

1. **Constitutional Law § 9; State § 1— lease agreements with State—authority of Council of State**

All lease agreements entered into by the Department of Administration on behalf of the State must be submitted to the Council of State for approval

Martin v. Thornburg

or disapproval; where the lowest proposal has not been presented to the Council of State, the Council of State's authority is not limited to approval or disapproval, and the Council of State may require a statement of justification and examine all proposals. However, nothing in the statutory framework authorizes the Council of State to require the Department of Administration to negotiate and enter any lease other than the lease proposed to it by the Department of Administration. N.C.G.S. § 146-25.

**2. Constitutional Law § 9; State § 1— lease of property for State—Council of State action without authority**

Where lease specifications issued by the Department of Administration for the Employment Security Commission contained a cutoff date of 17 May and required that the costs include utilities and janitorial services, or provide an acceptable method of determining the costs of those items, the trial court properly found that the lowest rental proposed within the meaning of N.C.G.S. § 146-25.1(c) was the LOBB proposal of $6.25 per square foot with services since the next lowest proposal was $4.84 per square foot (plus an average figure furnished by the State of $1.80 per square foot for services), and defendant Berry's revised proposal of $3.95 per square foot without services was submitted on 12 June. The Council of State was therefore limited to approving or disapproving the LOBB proposal and was without statutory authorization to direct the Department of Administration to negotiate with and enter into a lease with defendant Berry.

**3. Attorney General § 1— duty of Attorney General to defend State**

The duty of the Attorney General to appear for and defend the State or its agencies in actions in which the State may be a party or interested is not in derogation of or inconsistent with the executive power vested by the Constitution in the Governor. Art. III, § 1 of the North Carolina Constitution, N.C.G.S. § 114-2(1), N.C.G.S. § 114-1.1.

**4. Attorney General § 1; Constitutional Law § 9— power of Governor to employ special counsel—no certification by Attorney General**

When N.C.G.S. § 147-17(a) is construed as a whole, the last sentence gives the Governor the unrestricted right to "employ such special counsel as he may deem proper or necessary," so that the Governor may employ special counsel to represent the State without first being advised by the Attorney General that it is impracticable for the latter to represent the interest of the State.

ON discretionary review prior to a determination by the Court of Appeals granted by this Court pursuant to N.C.G.S. § 7A-31(a) and Rule 15(e)(1) of the North Carolina Rules of Appellate Procedure. Plaintiffs appealed from the entry of summary judgment in favor of defendants by *Preston, J.,* at the 26 August 1986 Session of Superior Court, WAKE County. Heard in the Supreme Court 14 May 1987.

*Brooks, Pierce, McLendon, Humphrey & Leonard by Hubert Humphrey, and Smith, Helms, Mulliss & Moore, by Stephen P. Millikin and Alan W. Duncan, for plaintiff-appellants.*

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, and McCoy, Weaver, Wiggins, Cleveland & Raper, by Richard Wiggins for defendant-appellees.*

FRYE, Justice.

The factual situation presented in this case requires determination of the following questions: (1) Once the Department of Administration has submitted to the Council of State the lowest lease proposal in accordance with requirements set forth in lease specifications, does the Council of State have the authority to examine all lease proposals and to require the Department of Administration to negotiate and enter a lease other than the lease proposal submitted by the Department of Administration; (2) does the duty of the Attorney General to appear for the State in any court proceeding in which the State may be a party as provided in N.C.G.S. § 114-2(1) violate Art. III, § 1, of the North Carolina Constitution; and (3) may the Governor, pursuant to N.C.G.S. § 147-17(a), employ special counsel in a proceeding in which the State is interested without first being advised by the Attorney General that it is impracticable for the latter to represent the interest of the State? We answer the first two questions in the negative while giving an affirmative answer to the third question.

Plaintiffs brought this declaratory judgment action to determine the rights and duties of the Governor and Council of State with respect to the entry of leases on behalf of the State and the rights and duties of the Governor and Attorney General in connection with lawsuits filed against the State.

The trial judge's findings of fact are summarized as follows:

Defendant Lois Carlyle Berry is the owner of a building and parking area located in Lumberton, North Carolina. For some time prior to 1980 the Employment Security Commission [ESC], through the Department of Administration [DOA], leased the building and parking area from defendant Lois Carlyle Berry [lessor]. During the period of time between 1980 and 1985, the

manager of the Lumberton ESC office experienced considerable difficulty with both the location of the office and his dealings with the lessor. In early 1985, prior to the end of the 1980 lease, the ESC advised the DOA that it was dissatisfied with the Berry lease location in the downtown area adjacent to the courthouse, because of inadequate parking, parking and traffic congestion, and other problems. The ESC requested that a new lease be entered into for a more desirable facility at a better location. Pursuant to the provisions of N.C.G.S. § 146-25.1, DOA obtained information and specifications from the ESC as to its needs in Lumberton and investigated relevant aspects of the matter. The DOA prepared a public advertisement, which the ESC properly ran in the Lumberton newspaper, soliciting proposals and stating, "Cut off time for receiving proposals is 2:00 p.m., Friday, May 17th, 1985." The DOA received proposals from four prospective lessors by the deadline. They were from Mrs. Berry, J. D. Herring, Biggs-Baker, and LOBB. On 12 June 1985, Mrs. Berry submitted a proposal to DOA revising her previously submitted bid. After due consideration, the DOA state property officials concluded, in good faith, that because of the lower proposed leasing cost, including utilities and janitorial services of $6.25 per square foot, and the preferable location, the LOBB proposal best served the public interest and the interest of the ESC in Lumberton.

The recommended LOBB proposal, along with several other recommended acquisitions by lease, was submitted by the DOA to the Council of State and was on the agenda for the 2 July 1985 meeting of the Council of State for its decision. The Governor did not attend the 2 July 1985 meeting of the Council of State due to his absence from Raleigh and presence in other cities within the state on state business. The Chief of the Property Section of DOA, Charles Holliday, his assistant, Mr. Rupert Conyers, and the Lumberton representatives, Mr. Singleton and Mr. Bittle, were all present at the 2 July meeting to answer questions and to explain DOA's recommendations as to all lease acquisitions recommended by them. After some questioning by its members, the Council of State disapproved the DOA's recommendation to award the Lumberton ESC contract to the LOBB partnership. Immediately thereafter, a discussion was had by the Council of State regarding the Berry proposal. Mrs. Berry's agent (her husband) was present and he was asked if he would re-lease the building to

the ESC at $6.25 per square foot and he responded by nodding his head in the affirmative. A motion was made by the Attorney General to the Council of State that the current lease with defendant Berry "be renegotiated at a cost of $6.25 per square foot," which was the same figure as the low proposal of LOBB including utilities and janitorial services. This motion was unanimously approved by the Council of State. The Council of State notified DOA's representatives present at the meeting that DOA should renegotiate the State's acquisition by lease of its office space requirements for the Lumberton ESC office with Mr. Berry at $6.25 per square foot.

After the 2 July 1985 meeting, no final action was taken by the DOA regarding the Lumberton ESC lease.

The Governor did not attend the 6 August 1985 meeting of the Council of State because of his absence from the State on State business. While the Lumberton ESC lease matter was not on the agenda, the DOA representative present at the meeting was questioned about the progress DOA was making toward execution of the contract with Mrs. Berry for the Lumberton ESC office pursuant to the 2 July action of the Council of State. Mr. Pugh advised the Council of State that the Governor's office and DOA had received some information about the lease which they believed the Council of State would want to take into consideration. At the 3 September 1985 Council of State meeting the Governor was present and stated he wanted to discuss the matter concerning a lease for the ESC in Lumberton. During the course of the meeting, the Governor expressed his position that (1) statutory authority given to the Council of State was to approve or disapprove a lease transaction that was recommended and submitted by the DOA; (2) statutory authority given to the Council of State did not go so far as to allow the Council to initiate a new lease transaction or to direct the DOA to cause a lease transaction not submitted by the Department to be implemented; (3) the approval of both the Governor and Council of State was statutorily required for the lease transaction to be implemented after submission by the DOA; and (4) the Governor did not approve the Berry proposal or any negotiation of a lease with Berry to the exclusion of other parties who had submitted bids. There ensued a lengthy discussion during which the majority of the members of the Council of State disagreed with the positions stated by the

Governor. A motion to reconsider the Council's 2 July action was defeated.

On 6 September 1985, Mr. Charles Holliday, Deputy Director of the State Property Office with DOA, requested new proposals from each of the four parties who had previously submitted a proposal for the Lumberton ESC offices. On 13 September 1985, Mrs. Berry notified the Governor and other State officials that she had formally accepted the offer by the State through the Council of State's action at its 2 July meeting. On 17 September 1985, Mrs. Berry filed an action in the Superior Court of Cumberland County alleging she had been awarded the contract with the State for the Lumberton ESC office lease and obtained a temporary restraining order against Secretary Rohrer restraining her from soliciting or receiving additional bid proposals for the Lumberton ESC office lease. Having discussed the respective positions of the Governor and the other members of the Council of State with a representative of the Governor, the Attorney General unilaterally determined he should enter his appearance in Mrs. Berry's action in Cumberland County; move for an extension of time to file answer or otherwise plead; and take such action as necessary to maintain the status quo between the State and Mrs. Berry for sixty days to enable him to advise and consult with the Council of State members, including the Governor. However, the Governor opened the 1 October 1985 Council of State meeting by announcing that he had commenced this action before the Attorney General could advise and consult with the Council of State (which includes the Governor) regarding the Berry action. With the knowledge and consent of the Governor and the Secretary of Administration, through counsel, the Attorney General on 2 December 1985 obtained a second extension of time for filing answer in the Cumberland County action. An order allowing a motion made by the Governor and the Secretary of Administration was filed and entered on 6 January 1986, staying proceedings in the Cumberland County action until the Wake County action has been finally determined, and providing that the temporary restraining order earlier entered should expire by its own terms on 6 January 1986. Pursuant to this order, there has been no further activity in the Cumberland County action since 6 January 1986. Pursuant to agreement, neither the Governor nor the Secretary of Administration has taken any steps to terminate the existing rela-

tionship and occupancy of the Berry property by the ESC in Lumberton, although the Governor and the Secretary of Administration have reserved the right, upon notice, to take such action regarding this matter as may be appropriate for the best interests of the public and the State of North Carolina.

The trial court held *inter alia* that: (1) the Governor did not have the authority separate and apart from his single vote as a member of the Council of State to approve or disapprove a lease of real property by the Department of Administration for the use of a state agency; (2) when the Department of Administration has presented and recommended to the Council of State a proposed lease which is the "lowest rental proposed," the Council of State has the authority to examine proposals submitted by other proposers; (3) the Council of State, after disapproving the Department of Administration's recommendation regarding the awarding of a lease, has the authority to direct the Department of Administration to negotiate with and to lease real property on behalf of the State at a rental and on terms determined by the Council of State; (4) the Attorney General has the authority to appear and defend any civil action filed against the State or department head without first obtaining the permission of the Governor or department head, and in the course thereof, to unilaterally determine the procedural steps necessary to defend the State's interest in the action; and (5) that the Governor does not have the authority to select independent legal counsel without first obtaining a statement from the Attorney General that it is impracticable for the Attorney General to represent the State. Plaintiffs appealed and this Court granted plaintiffs' motion to bypass the Court of Appeals.

[1] We first address the question of whether the Council of State was authorized to examine proposals other than the lowest rental proposed and to direct the Department of Administration to negotiate and enter into a lease on terms and with a lessor specified by the Council of State.

N.C.G.S. § 143-341(4)(d) gives the Department of Administration the power and duty to lease buildings for State agencies. N.C.G.S. § 146-22 provides that "every acquisition of land on behalf of the State or any State agency, whether by purchase, condemnation, lease, or rental, *shall be made by the Department*

*of Administration* and approved by the Governor and Council of State." (Emphasis added.) Under N.C.G.S. § 146-25.1(a), "if . . . the rental is estimated to exceed twelve thousand dollars ($12,000) per year or the term will exceed three years, the Department shall require the State agency desiring to rent land to prepare and submit for its approval a set of specifications for its needs. Upon approval of specifications, the Department shall prepare a public advertisement. The State agency shall place such advertisement in a newspaper of general circulation . . . . The advertisement . . . shall provide that proposals shall be received . . . in the State Property Office of the Department." N.C.G.S. § 146-25 provides that, "[i]f, after investigation, *the Department of Administration* determines that it is in the best interest of the State that land be leased or rented for the use of the State or of any State agency, *the Department shall proceed to negotiate* with the owners for the lease or rental of such property. All lease and rental agreements *entered into by the Department* shall be *promptly submitted to the Governor and Council of State* for approval or disapproval." (Emphasis added.) N.C.G.S. § 146-25.1(c) provides that, "[t]he Department of Administration shall present the proposed transaction to the Council of State for its consideration as provided by this Article. In the event the *lowest rental proposed is not presented to the Council of State, that body may require a statement of justification, and may examine all proposals.*"

These statutes clearly indicate that it is the role of the Department of Administration to investigate and negotiate lease proposals on behalf of the State and where applicable to require and approve specifications for such proposals. All lease agreements entered into by the Department of Administration on behalf of the State must be submitted to the Council of State for approval or disapproval. The authority of the Council with respect to lease proposals, however, is broadened in instances where the lowest lease proposal has not been presented to the Council of State. In such situations, the Council of State's authority is not limited merely to approving or disapproving lease agreements entered into by the Department of Administration, but rather the Council of State may *require a statement of justification* and also *examine all proposals.* Thus, to determine whether the Council of State had the additional authority in the

instant case to examine a lease which had not been submitted to it by the Department of Administration for approval or disapproval, we must determine whether the lease presented to the Council of State by the Department of Administration was the "lowest rental proposed." If so, the Council of State is authorized by the statute merely to approve or disapprove the proposal. If the lease was not the "lowest rental proposed," the Council of State is authorized to require a statement of justification and to examine all proposals. In either event, nothing in the statutory framework authorizes the Council of State to require the Department of Administration to negotiate and enter any lease other than the lease proposed to it by the Department of Administration. In an analogous situation, in *Commr. of Insurance v. North Carolina Automobile Rate Office*, 292 N.C. 1, 231 S.E. 2d 867 (1977), this Court, in construing a statute which provided that insurance rates "shall be submitted to the Commissioner of Insurance for approval," held that the Commissioner's authority was limited to approval or disapproval and that he was not authorized by this statute to fix rates himself or to order the rate office to revise rates.

We turn then to the question of whether the lease proposed by the Department of Administration to the Council of State was the "lowest rental proposed."

[2] The following facts are undisputed. The Employment Security Commission prepared and submitted lease specifications for approval by the Department of Administration. These specifications were reviewed and revised in the State Property Office of the Department of Administration and sent back to the Lumberton Employment Security Commission office, along with an advertising package and memorandum instructing it to run the advertisement. Both the memorandum and the advertisement provided that the cutoff time for receiving proposals was 2 p.m., Friday, 17 May 1985. The advertisement for office space for the Lumberton ESC office was published in the *Robesonian* newspaper. It instructed prospective lessors to contact the manager of the ESC office in Lumberton for specifications, proposals, and additional information. Paragraph XII of the specifications established by the Department of Administration for the Lumberton Employment Security Commission office provides in pertinent part as follows:

A. It is required that the following services be furnished and included in the per square foot cost to the satisfaction of the State.

1. All utilities, except telephone.

2. Daily janitorial and cleaning services and supplies.

3. Maintenance of building and grounds including lawn, shrubbery, sidewalks and parking areas should be performed as needed.

4. Elevator service, if applicable.

B. Alternate proposals which do not include utilities and/or janitorial services will be considered. (There must be an acceptable method of determining the State's share of costs).

Thus, the specifications for lease proposals *required* that the services contained in paragraph A be included in the per square foot cost of the lease proposals. In addition, the specifications indicated that alternate proposals which did not include utilities and/or janitorial services, though not required, would be considered, provided that there was an acceptable method of determining the State's share of the costs. The trial judge made the following finding of fact, based on the evidence presented before the court:

21. Plaintiff Grace J. Rohrer, Secretary, Department of Administration, through the State Property employees of her department, properly: established the specifications for the Lumberton ESC office; caused appropriate advertising for proposals to lease; reviewed the various prices of the four proposals received; visited the four sites offered; met with and reviewed the proposals with each of the bidders; reviewed and considered the ESC personnel's various complaints about their contentions as to the inadequacies of the Berry location and services provided for the period of the 1980 lease; and, after giving due consideration to all of the above factors, recommended to the Council of State that the contract for the lease of office space be awarded to the LOBB partnership.

The question of whether the "lowest rental proposed" was in fact submitted to the Council of State in the instant case requires a determination first of whether "lowest rental proposed" included the alternate proposals which did not include utilities and/or janitorial services. If such proposals are included, we must then determine whether the rental bids alone are sufficient to determine the "lowest rental proposed" or whether the cost to the State of providing the required services not included in the alternate proposal must be included in this determination. We believe that since the specifications specifically indicate that alternate proposals which do not include utilities and/or janitorial services will be considered, such proposals may be included in the determination of the "lowest rental proposed." However, because the specifications mandate that there be an acceptable method for determining the State's share of the costs, we hold that costs of providing the required services which are not included in the proposals must be added to the alternate proposal in determining the "lowest rental proposed." Thus, the "lowest rental proposed" is determined from those proposals which include the required services in the bid and those alternate proposals after factoring in the costs to the State of providing those services not included in the alternate proposals. The trial court made the following finding of fact:

> 13. Prior to the July 2, 1985 Council of State meeting, the lowest proposal, including utilities and janitorial services, was from LOBB, a partnership composed of four individuals, at $6.25 per square foot per annum. . . .

The purpose of requiring that the trial judge make findings of fact is to enable the reviewing court to determine "from the record whether the judgment—and the legal conclusions that underlie it—represent a correct application of law." *Patton v. Patton*, 318 N.C. 404, 406, 348 S.E. 2d 593, 595 (1986). The findings should be sufficient to indicate the evidence relied on by the trial court. *Id.* The evidence in the record revealed the following: The cutoff time for receiving proposals was 2 p.m. on 17 May 1985. Four proposals were submitted by this deadline. The Biggs-Baker proposal was $9.50 per square foot including all services; there was no proposal made based on no utilities or janitorial services. The Herring proposal was $9.20 per square foot with all required services provided and $5.50 per square foot with no janitorial or

utility services provided. The Berry proposal was $7.39 per square foot with all required services provided and $4.84 per square foot with no janitorial services provided. The LOBB proposal was $6.25 per square foot with all required services provided; the LOBB proposal did not include figures based on no utilities or janitorial services.

The only evidence in the record of the cost to the State of supply utilities and janitorial services for leased property appears in the Department of Administration's Recommendation Section of the Acquisition of Property Form (Plaintiff's Exhibit 78). The Department of Administration form discloses that the average cost of utilities and janitorial services is $1.80 per square foot. Using this figure, simple calculations reveal that the LOBB proposal is the lowest rental proposed, when the cost of utilities and janitorial services is included. The LOBB proposal, which is the lowest proposal that factors in the cost of such services, is $6.25 per square foot. The Berry proposal of $4.84 per square foot, which is the lowest proposal that does not factor in utilities or janitorial services, is increased to $6.64 per square foot once the average cost of utilities and janitorial services ($1.80 per square foot) is added. Thus, the trial court's finding that, "prior to the July 2, 1985 Council of State meeting the lowest proposal, including utilities and janitorial services, was from LOBB . . . at $6.25 per square foot per annum" was supported by the evidence.

Plaintiffs excepted to the trial court's finding of fact Number 12, which was as follows:

12. Depending on which choice was chosen by the State, the price per square foot cost of the four proposals received by the State Property Office varied from a low of $3.95 submitted by Berry without utilities and janitorial services to a high of $9.50 submitted by Biggs-Baker with utilities and janitorial services.

In finding of fact Number 9, the trial court found that the advertisement soliciting proposals stated that, "cut off time for receiving proposals is 2:00 p.m. Friday May 17, 1985." The Berry bid of $3.95 per square foot without utilities or janitorial services, however, was contained in a revised proposal which the trial court found was submitted on 12 June 1985. Thus, the revised Berry proposal was not received by the Department of Adminis-

tration prior to the deadline for receiving proposals. We conclude therefore that the LOBB proposal of $6.25 per square foot, found by the trial court to be the lowest proposal including utilities and janitorial services prior to 2 July 1985, was the "lowest rental proposed" within the meaning of N.C.G.S. § 146-25.1(c). Since the Department of Administration presented the "lowest rental proposed" to the Council of State at the 2 July 1985 meeting, the authority of the Council of State was limited to either approving or disapproving the proposal. The Council of State's further action in directing the Department of Administration to negotiate with and enter into a lease with Mrs. Berry was therefore without statutory authorization.

[3] Next we consider whether the duty of the Attorney General to appear for the State in any proceeding in which the State may be a party as provided for in N.C.G.S. § 114-2(1) violates Article III, § 1, of the North Carolina Constitution.

Article III, § 1, of the North Carolina Constitution provides that "[t]he executive power of the state shall be vested in the Governor." Article III, § 7(1), provides for the election of additional State officers within the executive branch, including an Attorney General. Article III, § 7(2), provides that the duties of the Attorney General and the other elective State officers "shall be *prescribed by law*." (Emphasis added.)

The North Carolina Constitution does not prescribe the duties of the Attorney General. The general duties assigned to the Attorney General are set forth in N.C.G.S. § 114-2, which establishes that it shall be the duty of the Attorney General to appear for the State in any court in which the State may be a party and to represent all State departments, agencies, and commissions. In addition, N.C.G.S. § 114-1.1 provides that the "Attorney General has had and continues to be vested with those powers of the Attorney General that existed at the common law, that are not repugnant to or inconsistent with the Constitution or laws of North Carolina." The term "common law" as used in North Carolina statutes refers to the common law of England, *State ex rel. Bruton v. Flying "W" Enterprises, Inc.*, 273 N.C. 399, 160 S.E. 2d 482 (1968), more specifically, "the common law of England as of the date of the signing of the Declaration of Independence." *Steelman v. City of New Bern*, 279 N.C. 589, 592,

184 S.E. 2d 239, 241 (1971). The duties of the Attorney General in England included the duty to prosecute all actions necessary for the protection and defense of the property and revenue of the Crown. Morgan, *The Office of the Attorney General*, 2 N.C. Cent.L.J. 165 (1970). *See also Tice v. Dept. of Transportation,* 67 N.C. App. 48, 312 S.E. 2d 241 (1984). In North Carolina the sovereign power no longer resides in the Crown but rather is vested in and derived from the people. N.C. Const. Art. I, § 2. Therefore, the Attorney General of this State has the common law duty to prosecute all actions necessary for the protection and defense of the property and revenue of the sovereign people of North Carolina. The word "prosecute" has been defined to mean "to follow up; to carry on an action or other judicial proceeding." *Black's Law Dictionary* 5th ed., p. 1099 (1979). That the common law duty of the Attorney General to prosecute actions includes a duty to defend actions instituted against the interest of the sovereign power finds support in the following general statement of law:

> In the absence of explicit legislative expression to the contrary, the attorney general possesses entire dominion over every civil suit instituted by him in his official capacity . . ., and his authority extends as well to control of defense of civil suits against the state, its agencies, and officers.

7A C.J.S. Attorney General § 12 (1980). We conclude therefore that the duties of the Attorney General in North Carolina as prescribed by statutory and common law include the duty to appear for and to defend the State or its agencies in all actions in which the State may be a party or interested.

The independent executive offices of Governor and Attorney General with their differing functions and duties under the constitution create a clear potential for conflict. *Tice v. Dept. of Transportation*, 67 N.C. App. 48, 312 S.E. 2d 241. However, such is not the case here since the duty of the Attorney General to appear for and defend the State or its agencies in actions in which the State may be a party or interested is not in derogation of or inconsistent with the executive power vested by the constitution in the Governor.

[4] Lastly we address the question of whether the Governor, pursuant to N.C.G.S. § 147-17(a), may employ special counsel as

he may deem proper and necessary to represent the State without first being advised by the Attorney General that it is impracticable for the latter to represent the interest of the State.

N.C.G.S. § 147-17(a) provides as follows:

> No department, officer, agency, institution, commission, bureau or other organized activity of the State which receives support in whole or in part from the State shall employ any counsel, except with the approval of the Governor. The Governor shall give his approval only if the Attorney General has advised him, as provided in subsection (b) of this section, that it is impracticable for the Attorney General to render the legal services. In any case or proceeding, civil or criminal, in or before any court or agency of this State or any other state or the United States, or in any other matter in which the State of North Carolina is interested, the Governor may employ such special counsel as he may deem proper or necessary to represent the interest of the State, and may fix the compensation for their services.

Defendants contend that the second sentence in this statute limits the power of the Governor to employ special counsel to only those cases where the Attorney General certifies that it is impracticable for the Attorney General to render legal services. We cannot agree.

The first sentence of this statute provides *inter alia* that no officer of the State shall employ any counsel except with the approval of the Governor. The second sentence provides that the Governor shall give his approval only if the Attorney General has advised him that representation by the Attorney General would be impracticable. The Governor is clearly an officer of the State, and therefore if read alone the first two sentences of this statute would limit power of the Governor to employ special counsel to only those cases where the Attorney General has made the requisite certification. If this were the intended meaning of N.C.G.S. § 147-17(a), the third sentence would be mere surplusage. It is well settled, however, that in interpreting the meaning of a statute, all parts of a single statute will be read and construed as a whole to carry out the legislative intent. 12 Strong's N.C. Index 3d *Statutes* § 5.1 (1978). "In seeking to discover and give effect to the legislative intent, an act must be considered as a whole, and

none of its provisions shall be deemed useless or redundant if they can reasonably be considered as adding something to the act which is in harmony with its purpose." *State v. Harvey,* 281 N.C. 1, 19-20, 187 S.E. 2d 706, 718 (1972). The last sentence in N.C.G.S. § 147-17(a) states that "In *any case or proceeding, civil or criminal,* in or before any court or agency of this State or any other state or the United States, or in any other matter in which the State of North Carolina is interested, the Governor may employ such special counsel *as he may deem proper or necessary* to represent the interest of the State, and may fix the compensation for their services." (Emphasis added.) Therefore construing the statute as a whole, we conclude that the last sentence of Section 147-17(a) gives the Governor the unrestricted right to "employ such special counsel as he may deem proper or necessary." Thus it is unnecessary to consider plaintiffs' contention that such authority exists by virtue of the executive power vested in the Governor by the North Carolina Constitution.

While the parties argue other grave constitutional and statutory questions which may arise in the event of continued differences between the various executive officers of the State, we decline to decide them on this state of the record. This is in keeping with the rule in this State that appellate courts will not "pass upon constitutional questions, even when properly presented, if there be also present some other ground upon which the case may be made to turn." *Reed v. Madison,* 213 N.C. 145, 147, 195 S.E. 620, 622 (1938). We thus modify and affirm the trial court's holding that the Attorney General has the authority to appear and defend actions on behalf of the State; we reverse the holdings limiting the Governor's authority under N.C.G.S. § 147-17(a) and authorizing the Council of State to direct the Department of Administration to execute a lease; and we vacate that portion of the judgment below which decides other questions not reached herein.

Modified in part; reversed in part; vacated in part and remanded.