**PUBLISHED**

Filed: April 20, 2006

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

WILLIE BROWN, JR.,
                    *Plaintiff-Appellant,*

v.

THEODIS BECK, Secretary, North
Carolina Department of Corrections;
MARVIN POLK, Warden, Central
Prison, Raleigh, North Carolina;
UNKNOWN EXECUTIONERS,
                    *Defendants-Appellees.*

No. 06-9
(5:06-ct-03018-H)

---

**O R D E R**

By order dated April 17, 2006, the district court denied the motion of Willie Brown, Jr. for a preliminary injunction enjoining the defendants from carrying out his execution which is scheduled for Friday, April 21, 2006. Brown has filed a notice of appeal to this Court from that order, a motion for preliminary injunction and a brief in support. Appellees filed a brief opposing appellant's motion for preliminary injunction.

The Court affirms the district court's denial of a preliminary injunction and directs the clerk to issue the mandate forthwith.

Entered at the direction of Judge Luttig with the concurrence of Judge Traxler. Judge Michael wrote the attached dissent.

For the Court

/s/ Patricia S. Connor
Clerk

MICHAEL, Circuit Judge, dissenting:

I respectfully dissent from the majority's affirmance of the district court's denial of a preliminary injunction to temporarily block the execution of Willie Brown, Jr. Brown is a North Carolina death row inmate scheduled to be executed by lethal injection on April 21, 2006, at 2:00 a.m. He filed a § 1983 action seeking to enjoin the warden and others ("the State") from executing him by lethal injection under the procedures the State intended to employ. Specifically, Brown contends that the State will use an inadequate protocol for anesthesia as a precursor to carrying out his death sentence, and that as a result he faces an unacceptable and unnecessary risk of suffering excruciating pain during his execution in violation of the Eighth Amendment. *See Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (recognizing, in the context of executions, that the Eighth Amendment prohibits punishment "involv[ing] the unnecessary and wanton infliction of pain"); *In re Kemmler*, 136 U.S. 436, 447 (1890) (recognizing that the Eighth Amendment prohibits "torture or a lingering death"). The district court, in its final order, denied Brown's motion for a preliminary injunction enjoining his execution on the ground that the State's revised protocol ensures that Brown will be rendered unconscious during the execution and will not feel pain. Because this finding is not supported by the clear weight of the evidence, I would reverse.

In its April 7, 2006, order the district court determined that there were "substantial questions as to whether North Carolina's execution protocol creates an undue risk of excessive pain." (Order, 13-14, Apr. 7, 2006.) Specifically, the court found that inadequate administration of anesthesia prior to execution would undisputedly make Brown "suffer excruciating pain as a result of the administration of pancuronium bromide and potassium chloride." (*Id.* at 12.) The court further determined that any difficulties could be addressed if

> there are present and accessible to [Brown] throughout the execution personnel with sufficient medical training to ensure that [Brown] is in all respects unconscious *prior to* and *at the time of* the administration of any pancuronium bromide or potassium chloride. Should [Brown] exhibit effects of consciousness at any time during the execution, such personnel shall immediately provide appropriate medi-

cal care so as to insure [Brown] is immediately returned to an unconscious state.

(*Id.* at 14.)

On April 12, 2006, the State responded by proposing a revised protocol that uses a bispectral index (BIS) monitor, a device that, according to the State, can monitor Brown's level of consciousness during the execution procedure. Over Brown's objections, the district court determined that the revised protocol will ensure that Brown is rendered unconscious prior to and throughout the period during which lethal drugs are injected into his bloodstream, so that he will not perceive pain during his execution. The court stated,

> [The State] will not administer lethal drugs until *after* total unconsciousness of the plaintiff has been verified through use of the BIS monitor. Thus, [Brown's] concerns about human error are greatly mitigated by the use of this independent check on [his] level of consciousness before the potentially pain-inducing injections . . . begin. Whatever concerns might be raised about this "machine" or about the propriety of using it in executions, it is apparent to this court that the BIS monitor has been used reliably for a decade and is used in many anesthesia procedures across the country to determine an individual's level of consciousness.

(Final Order, 6, Apr. 17, 2006). Because these findings are not supported by the clear weight of the evidence in the record, the district court abused its discretion in denying Brown's motion for a preliminary injunction. *See Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475 (4th Cir. 2005) ("A district court abuses its discretion if its conclusion . . . rests upon a clearly erroneous factual finding."); *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 379 (4th Cir. 1995) (recognizing that a district court conclusion that is "contrary to the clear weight of the evidence considered in light of the entire record" is clearly erroneous).

First, the district court's finding that the BIS monitor alone will accurately verify Brown's level of consciousness is contrary to the clear weight of the evidence considered in light of the entire record.

Brown presents an impressive array of evidence that although a BIS monitor may be helpful in assessing the effectiveness of anesthesia, it is not suitable as the State intends to use it — as the sole indicator of Brown's level of consciousness. "It is virtually universally accepted and understood by all anesthesiologists that the BIS monitor and other brain function monitors cannot be used as the sole method for assessing anesthetic depth," but must be used alongside other markers of consciousness (such as purposeful reflex movement, blood pressure, and heart rate). (Third Aff. of Dr. Mark Heath ¶¶ 8-9.) In addition to offering testimony to this effect from three leading medical experts, Brown offers persuasive evidence from independent, authoritative sources. For instance, Aspect Medical Systems, the manufacturer of the BIS monitor purchased by the State, warns that "[c]linical judgment should always be used when interpreting the BIS in conjunction with other available clinical signs. Reliance on the BIS alone for intraoperative anesthetic management is not recommended." Aspect Medical Systems, Considerations for Using BIS, *at* http://www.aspectmedical.com/resources/proc_cards/or/components_ anesthesia.htm. Likewise, the American Society of Anesthesiologists (ASA) and the American Association of Nurse Anesthetists have promulgated standards that counsel against the use of brain functioning technology, such as BIS monitors, in isolation without other monitoring methods or interpretation by personnel with appropriate training in anesthesia. Most notably, the ASA has observed:

> The general clinical applicability of [BIS monitors] in the prevention of intraoperative awareness has not been established. Although a single randomized clinical trial reported a decrease in the frequency of awareness in high-risk patients, there is insufficient evidence to justify a standard, guideline, or absolute requirement that these devices be used to reduce the occurrence of intraoperative awareness in high-risk patients [or any other group of patients] undergoing general anesthesia.

American Society of Anesthesiologists, *Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 855 (2006) (attached as Ex. 1 to Third Heath Aff.). Likewise, a recent study on the reliability of BIS monitors in the medical journal *Anesthesiology* concludes that "[a]nesthesia providers

should not rely exclusively on the BIS reading when assessing depth of anesthesia." *See* Dagmar J. Niedhart et al., *Intrapatient Reproducibility of the BISxp® Monitor*, 104 Anesthesiology 242, 242 (2006) (attached as Ex. 2 to Third Heath Aff.)

The State offers scant evidence to rebut Brown's compelling proffer. The State relies solely on the conclusory assertion of its expert, Dr. Mark Dershwitz, that in his opinion, "beyond a reasonable degree of medical certainty, . . . the utilization of the BIS monitor as part of the execution protocol . . . will prevent the possibility of [Brown] being *awake* during the administration of pancuronium or potassium chloride." (emphasis added) (Third Aff. of Dr. Mark Dershwitz ¶ 11.) Even if Dr. Dershwitz opined that Brown would not be *conscious* (rather than simply not awake), the basis for his opinion is questionable: the State offers no evidence to counter Brown's persuasive argument that the BIS monitor cannot be used in isolation to determine an individual's level of consciousness. Furthermore, Dr. Dershwitz's opinion on this point is particularly suspect because just two months ago he opined in another case that, absent further testing, "it would not be prudent to recommend the use of the BIS monitor during lethal injections." Dershwitz Rebuttal Report, *Walker v. Johnson*, No. 1:05cv934, at 4-5 (E.D. Va. Feb. 3, 2006) (attached as Ex. B to Brown's Objection to Def.'s Notice and Response to 7 April 2006 Order). In finding that the BIS monitor will adequately verify Brown's unconsciousness during his execution, the district court disregarded substantial evidence, unrebutted by the State, that casts serious doubt on the reliability of the BIS monitor as the sole means of assessing consciousness.

In addition, there is no support in the record for the district court's finding that if Brown remains conscious (or regains consciousness) during the execution, medical professionals will be able to bring about the injection of additional sodium pentothal until Brown is rendered fully unconscious. Under the revised protocol, only if the BIS monitor displays a value below 60 will the State proceed to administer the pancuronium bromide (the second drug in the lethal injection protocol which causes paralysis) and the potassium chloride (the third drug in the lethal injection protocol which causes the heart to stop beating). (Second Aff. of Marvin Polk ¶¶ 2-4.) In the event the BIS value reading remains at 60 or above, "additional sodium pentothal

[will] be given until the value reading on the BIS monitor does fall below 60." (*Id.* ¶ 4.) Although the protocol provides that "[t]he BIS monitor will be located such that it can be observed and its values read by [the licensed registered nurse and the licensed physician who observe the Cardiac Monitor Defibrillator]," it makes no provision for these medical professionals to actually *do* anything in the event the reading does not fall below 60. (Def.'s Notice and Response to 7 April 2006 Order, 3.) Thus, if Brown's BIS reading exceeds 60 or he otherwise is conscious during the execution, the State will take the same inadequate steps to secure Brown's unconsciousness that it would have taken under the original protocol. Even if the revised protocol could be construed as requiring the medical professionals to take some action to ensure Brown's unconsciousness, undisputed evidence in the record establishes that, based on the execution chamber's physical set-up, neither the warden nor any other member of the execution team can observe or respond to a malfunction in the lethal injection process. (First Aff. of Nancy Bruton-Maree ¶ 10.) Moreover, even if a medical professional could respond, there is no evidence in the record to support the district court's finding that the professional would possess the skills necessary to ensure Brown's unconsciousness.

Also problematic is the lack of evidence to show that the BIS monitor will accurately measure consciousness after pancuronium bromide and potassium chloride are administered. Dr. Heath opines that the administration of pancuronium bromide can lead to an inaccurate indication of anesthetic depth on a BIS monitor. He bases this opinion on a study finding that BIS readouts far below 60, the value proposed by the State as indicating an inmate's unconsciousness, can be observed in fully conscious individuals who have been administered paralysis-inducing drugs similar to pancuronium bromide. M. Messner et al., *The Bispectral Index Declines During Neuromuscular Block in Fully Awake Patients*, 97 Anesthesia & Analgesia 488 (2003) (attached as Ex. 5 to Third Heath Aff.) In addition, Dr. Dershwitz, the State's expert, has recently hypothesized that a BIS monitor cannot assess the level of consciousness once potassium chloride is administered. *See* Dershwitz Rebuttal Report, *Walker v. Johnson*, No. 1:05cv934, at 4-5 (E.D. Va. Feb. 3, 2006) (attached as Ex. B to Brown's Objection to Def.'s Notice and Response to 7 April 2006 Order). Indeed, the revised protocol does not indicate whether the BIS

monitor will be used after administration of the second drug, pancuronium bromide, and nothing else in the record indicates that Brown's consciousness will be monitored after this point in the execution. The district court's finding that the revised protocol will ensure that Brown is rendered unconscious "throughout the period during which lethal drugs are injected into his bloodstream" is therefore clearly erroneous. (*See* Final Order, 2, Apr. 17, 2006.)

Before the State revised its execution protocol, the district court concluded that the preliminary injunction hardship-balancing test favored Brown: that "the likelihood of irreparable harm to Brown far exceeds the likelihood of harm to Defendants." (Order, 12, Apr. 7, 2006.) If Brown does, in fact, regain consciousness at any point during his execution, "there is no dispute that [he] will suffer excruciating pain as result of the administration of pancuronium bromide and potassium chloride" and that he, having suffered a tortuous death, will have no meaningful retrospective relief. (*Id.* at 11-12.) The district court conditionally denied Brown's motion for preliminary injunction with the requirement that the State add safeguards to ensure that Brown is in fact unconscious during his execution. In an effort to comply with the district court's order, and thereby shift the balance of hardships, the State incorporated use of the BIS monitor. The clear weight of evidence, however, reveals that the State's use of the BIS monitor will *not* adequately ensure that Brown will remain unconscious throughout his execution. The balance of hardships therefore remains weighted in Brown's favor. Accordingly, I would reverse the district court's denial of Brown's motion for a preliminary injunction and direct that court to enter the preliminary injunction and conduct further proceedings, which would allow to State to further revise its protocol.