JERRY W. CONNER, JAMES A. CAMPBELL, JAMES EDWARD THOMAS, MARCUS ROBINSON, AND ARCHIE LEE BILLINGS, PETITIONERS v. NORTH CAROLINA COUNCIL OF STATE, RESPONDENT

No. 213PA10

(Filed 7 October 2011)

**1. Administrative Law— North Carolina Administrative Procedure Act—approval of lethal injection protocol**

Respondent North Carolina Council of State's statutorily-mandated approval of the lethal injection protocol for inmates who have been sentenced to death by lethal injection was not subject to the requirements of the North Carolina Administrative Procedure Act N.C.G.S. § 15-188 placed primary responsibility for the lethal injection protocol upon the promulgating agency, the Department of Correction, and the statute did not give the Council authority beyond merely approving or disapproving the submitted protocol.

**2. Prisons— approval of execution protocol—statutory rights of prisoners**

Although the superior court erred by dismissing petitioners' declaratory judgment action claiming that the North Carolina Council of State's approval of the execution protocol violated N.C.G.S. § 15-188, the superior court correctly concluded that petitioner death row prisoners' rights under N.C.G.S. § 1 5-188 were limited to the obligation that their deaths be by lethal injection, in a permanent death chamber in Raleigh, and carried out pursuant to an execution protocol approved by the Governor and the Council of State.

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of an order dismissing petitioners' petition for judicial review and denying and dismissing petitioners' declaratory judgment action entered on 14 May 2009 by Judge Donald W. Stephens in Superior Court, Wake County. Heard in the Supreme Court on 14 March 2011.

*Center for Death Penalty Litigation, by David Weiss, for petitioner-appellants; and Kevin P. Bradley for petitioner-appellant Billings; Kenneth J. Rose, E. Hardy Lewis, and Mark J. Kleinschmidt for petitioner-appellant Conner; Elizabeth F. Kuniholm for petitioner-appellant Campbell;*

*Michael R. Ramos and Geoffrey W. Hosford for petitioner-appellant Robinson; and Ann Groninger and Robert E. Zaytoun for petitioner-appellant Thomas.*

*Roy Cooper, Attorney General, by Thomas J. Pitman, Special Deputy Attorney General, and Joseph Finarelli, Assistant Attorney General, for respondent-appellee.*

JACKSON, Justice.

Petitioners in this action are inmates who have been sentenced to death by lethal injection. Respondent is the North Carolina Council of State ("the Council"). Although the underlying substance of this case centers on the constitutionality of the State's method of execution, the narrow issue before us in this appeal is a procedural one: Is the Council's statutorily-mandated approval of an administrative agency's action subject to the requirements of the North Carolina Administrative Procedure Act ("APA") when the promulgating agency's action is exempt from the APA? We hold that it is not. We also address whether the superior court erred by dismissing petitioners' declaratory judgment action. Although we conclude that the superior court erred by dismissing the claim, we also hold that the superior court correctly defined petitioners' rights pursuant to the statute at issue.

## Factual and Procedural Background

The events related to this matter began in early 2007.[1] On 31 January 2007, the North Carolina Academy of Trial Lawyers[2] submitted a letter, along with approximately 150 pages of additional materials, to Governor Michael F. Easley. The letter informed Governor Easley that a lethal injection protocol likely would be submitted to the Council for its approval, outlined the legal controversies sur-

---

1. This case is one of several related legal actions, filed in both state and federal courts, challenging the constitutionality of lethal injection as a method of executing inmates sentenced to death. Two recent iterations of this complex legal question are the Fourth Circuit Court of Appeals case of *Brown v. Beck*, 445 F.3d 752, 752-53 (4th Cir.) (per curiam) (affirming the district court's denial of a preliminary injunction enjoining petitioner's execution on the condition that medical personnel be present at petitioner's execution to ensure that the inmate is unconscious prior to and during administration of the lethal drugs), *cert. denied*, 547 U.S. 1096, 164 L. Ed. 2d 566 (2006), and this Court's decision in *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 205, 675 S.E.2d 641, 651 (2009) (holding that the Medical Board exceeded its authority by issuing a Position Statement that "directly contravene[d] the specific requirement of physician presence found in N.C.G.S. § 15-190").

2. Now the North Carolina Advocates for Justice.

rounding lethal injection, and requested an opportunity to address the Council.

On 1 February 2007, attorneys for petitioners Conner and Billings submitted a "Petition for Rule Related to the Duties of the Council of State Pursuant to N.C. Gen. Stat. § 15-188" to the Council via its secretary, David McCoy ("McCoy"). Petitioners' proposed rule read: "The State of North Carolina shall not employ the bispectral ('BIS') index monitor for use in executions."[3] Petitioners explained that no other state uses the BIS monitor during executions, that the Food and Drug Administration ("FDA") has not approved the BIS monitor for use in executions, that the company that sold the BIS monitor to the Department of Correction ("DOC") had not been informed that it would be used in executions and would not have sold the device to the State had it known of the anticipated use, and that "the BIS monitor is not an effective measure of an inmate's level of consciousness." Petitioners also set forth the procedures they believed the Council should employ to adopt their proposed rule in accordance with the APA.

On 5 February 2007, an attorney for petitioner Campbell also requested the opportunity to be heard by the Council at its next meeting. McCoy responded on the same day and informed the attorney that "[t]he Council of State's monthly meeting is a regularly scheduled business meeting and is not a public hearing," and "[r]outinely, there is no public comment component on the Council's agenda."

A proposed execution protocol was on the agenda for the Council's 6 February 2007 meeting. In accordance with statutory requirements, the Warden of Central Prison ("the Warden") and the Secretary of the DOC submitted a lethal injection protocol to the Council of State for its review prior to its 6 February meeting. *See* N.C.G.S. § 15-188 (2009) ("The superintendent of the State penitentiary shall also cause to be provided, in conformity with this Article and approved by the Governor and Council of State, the necessary appliances for the infliction of the punishment of death and qualified personnel to set up and prepare the injection, administer the preinjections, insert the IV catheter, and to perform other tasks required for this procedure in accordance with the requirements of this Article."). The protocol read:

---

3. The BIS monitor is an appliance that measures the electrical activity in one's brain. Its purpose in this context is to monitor a condemned prisoner's level of consciousness during the execution procedure.

Execution Protocol

Chapter 15, Article 19, of the North Carolina General Statutes prescribes the manner and procedures through which the sentence of death shall be carried out through lethal injection by the State of North Carolina acting through the North Carolina Department of Correction and the Warden of Central Prison. Article 19 vests the Warden of Central Prison with direct responsibility for providing necessary drugs, appliances and qualified personnel to carry out the sentence of death in accordance with law and the Execution Protocol approved by the Governor and Council of State. The following Execution Protocol has therefore been developed by the Warden of Central Prison and approved by the Secretary of the North Carolina Department of Correction.

I. Lethal Injection

Death by lethal injection is caused by the administration of a lethal quantity of an ultrashort-acting barbiturate, such as sodium pentothal, in combination with a chemical paralytic agent, such as pancuronium bromide, and potassium chloride into the veins of a condemned prisoner. The condemned prisoner's level or state of consciousness during the execution process is observed visually and monitored utilizing an appliance, such as a bispectral index (BIS) monitor, from which the electrical activity in the condemned prisoner's brain can be interpreted.

The lethal injection protocol ordinarily involves the successive, simultaneous slow intravenous administration of the three lethal chemicals and non-lethal saline solution into the body of a condemned prisoner through two IV lines by means of a series of five injections. The lethal injection protocol is composed of the following steps:

a) The first injection is an ultrashort-acting barbiturate, such as a dose of not less than 3000 mg of sodium pentothal, which quickly renders the condemned prisoner unconscious.

b) The second injection is a dose of not less than 30 mL of a saline solution, which flushes the equipment used for the intravenous administration of the lethal chemicals and saline solution following the administration of the ultrashort-acting barbiturate.

c) The Warden of Central Prison pauses the administration of the lethal chemicals and saline solution to verify

that the output value displayed on the monitoring appliance, such as a value reading on a BIS monitor below 60, confirms a reduced level of electrical activity in the condemned prisoner's brain sufficient to indicate a very high probability of unconsciousness.

d) If a very high probability of unconsciousness is confirmed, such as a value reading on a BIS monitor below 60, the Warden resumes the injection of the remaining lethal chemicals and saline solution. However, if a very high probability of unconsciousness is not confirmed, such as a value reading on a BIS monitor of 60 or above, repeated identical injections of the ultrashort-acting barbiturate, such as doses of not less than 3000 mg of sodium pentothal, will be administered until a very high probability of unconsciousness is confirmed, such as a value reading on a BIS monitor below 60, and the injection of the remaining lethal chemicals and saline solution is resumed.

e) The third injection is a chemical paralytic agent, such as a dose of not less than 40 mg of pancuronium bromide, which paralyzes the muscles of the condemned prisoner.

f) The fourth injection is a dose of not less than 160 mEq of potassium chloride, which interrupts nerve impulses to the heart causing the condemned prisoner's heart to stop beating.

g) The fifth injection is a dose of not less than 30 mL of a saline solution, which flushes the equipment used for the intravenous administration of the lethal chemicals and saline solution and completes the lethal injection protocol.

II. Appliances

The Warden will acquire, from reputable manufacturers or suppliers, all appliances, equipment and other supplies as are required to carry out the administration of lethal drugs as described above. Such appliances, equipment and supplies shall include, at a minimum, the syringes, intravenous tubes and related materials ordinarily used by medical personnel to administer intravenous fluids to human patients. The Warden will also acquire and maintain such monitors or other equipment as shall be necessary to review human vital signs and functions, including cardiac activity, electrical activity in the brain, and respiration. The Warden

will also be responsible for acquiring such other appliances, equipment, supplies or materials as medical personnel shall recommend for the purpose of ensuring that the sentence of death is carried out without exposing the condemned prisoner to a substantial risk of serious harm, pain or suffering and in accordance with constitutional requirements.

III. Personnel

The Warden shall ensure that the lethal injection procedure is administered by personnel who are qualified to set up and prepare the injections described above, administer the preinjections, insert the IV catheter, and to perform other tasks required for this procedure in accordance with the requirements of Article 19 and this Execution Protocol. Medical doctors, physician assistants, advanced degree nurses, registered nurses, and emergency medical technician-paramedics, who are licensed or certified by their respective licensing boards and organizations, shall be deemed qualified to participate in the execution procedure. As required by Article 19, a licensed medical doctor shall be present at each execution. The doctor shall monitor the essential body functions of the condemned inmate and shall notify the Warden immediately upon his or her determination that the inmate shows signs of undue pain or suffering. The Warden will then stop the execution. The doctor shall also be responsible for certifying the death of the inmate at such time as he or she determines the procedure has been completed as required by N.C.G.S. §15-192.

It is the intent of this Execution Protocol to carry out the sentence of death as required by the North Carolina General Statutes in accordance with all constitutional requirements as determined by the courts of North Carolina and the United States.

According to a representative from the Attorney General's Office who spoke at the Council's 6 February meeting, the protocol was intended to address concerns raised in the context of pending litigation. Stays had been issued in three pending executions until the protocol was adopted by the DOC and approved by the Council.

At the 6 February meeting, the Council addressed the lethal injection protocol submitted by the DOC. The Council's discussion focused on two primary issues: (1) the historical basis for the 1909 General Assembly's requirement that the Council approve execution protocols, which, according to Governor Easley, was "to make cer-

tain that the cost did not overrun" when the legislature was not in session to make that determination, and (2) the controversy with the North Carolina Medical Board with respect to its position statement prohibiting physician participation in executions. The State Treasurer specifically expressed concern with the Council's approval role with respect to the execution protocol, noting that "this body is not equipped to have a—a policy discussion. And I don't know a better way to make that point than we're not even allowed to hear from people, . . . and . . . that's a consistent rule on all matters we hear from duly hired members of the executive branch." Following presentations from the Attorney General's Office and the DOC Secretary about the pending litigation concerning the constitutionality of the lethal injection procedure and the stays issued in those cases, the Council approved the protocol by a voice vote. Three "no" votes were recorded; however, there is no record of how the Governor or the remaining six members of the Council voted. The Council also unanimously approved a motion to request that the General Assembly "remove the requirement that the Governor and Council of State be required to approve appliances or personnel procedures in capital cases involving the punishment of death."

On 15 and 20 February 2007, petitioners filed petitions for contested case hearings with the Office of Administrative Hearings ("OAH"), alleging, in relevant part, that the Council is an "Agency" within the meaning of the APA and that the Council "failed to follow the requirements for the adoption of a permanent rule" when it approved the protocol.

On 2 May 2007, the OAH administrative law judge ("ALJ") assigned to the matter allowed the Council's motion to dismiss the contested case "as to the allegations regarding rulemaking." However, he denied the motion to dismiss "as to the other matters regarding the actions of the [Council] in approving the execution protocol."

On 21 May 2007, the ALJ conducted an evidentiary hearing as to petitioners' contested case proceeding. Then on 31 May 2007, McCoy responded to the rule-making petition on behalf of the Council, quoting the APA with respect to the DOC's exemption and stating that "since the General Assembly has provided clear and strict guidance to the Council of State and all others on the application of Chapter 150B [the APA] to rules related to 'prisoners, probationers, and parolees', your request to 'Petition for Rule" cannot be granted."

On 9 August 2007, the ALJ recommended that the Council reconsider its approval of the lethal injection protocol. On 1 November 2007, the Governor and Council issued a final agency decision and order, in which the Council declined to reconsider its approval based upon its conclusion that the OAH did not have jurisdiction to review the issue.

Petitioners filed for judicial review of the Council's final decision in Wake County Superior Court on 3 December 2007. Their petition challenged the Council's final agency decision and its 6 February 2007 approval of the protocol, claiming that such actions did not "satisf[y] the requirements mandated by N.C.G.S. § 15-188 and by the [APA]." The petition also included a claim for declaratory judgment as to the Council's potential violation of petitioners' due process rights and of section 15-188 of the North Carolina General Statutes. On 6 February 2008, the Council filed a response to the petition, which included a motion to dismiss the claim for declaratory judgment.

The superior court heard oral arguments from the parties in October 2008, but deferred ruling upon the issues presented until this Court issued its decision in *North Carolina Department of Correction v. North Carolina Medical Board*, 363 N.C. 189, 675 S.E.2d 641 (2009). Then on 13 May 2009, the superior court: (1) dismissed petitioners' request for judicial review, holding that the court lacked jurisdiction to review the matter pursuant to the judicial review provisions of the APA; (2) dismissed petitioners' claims for declaratory judgment, concluding that "[t]here appears to be no case or controversy or unique statutory construction necessary to interpret the language of this statute" and "[a]ny rights of a condemned inmate under this statute are limited to the obligation that his death be by lethal injection, in a permanent death chamber in Raleigh, and carried out pursuant to an execution protocol approved by the Governor and the Council of State"; and (3) upheld the Council's approval of the execution protocol.

On 11 June 2009, petitioners appealed the superior court's order to the Court of Appeals. This Court allowed the Council's petition for discretionary review prior to a determination by the Court of Appeals on 7 October 2010.

## Applicability of the APA

[1] Petitioners' first argument to this Court is that the superior court erred in concluding that they cannot challenge the Council's approval of the execution protocol pursuant to the APA. We disagree.

In this action, petitioners do not challenge the substance of the lethal injection protocol or the role of the DOC in promulgating it; rather, the question before us is a narrow one, which centers on the Council of State and the procedural requirements that may be attached to its approval authority. Because the Council of State rarely has been the subject of this Court's jurisprudence, we begin our discussion with a brief overview of the Council's purpose and the scope of its authority.

Unlike many other state agencies, the Council of State is a creation of the North Carolina Constitution. Our constitution provides that "[t]he Council of State shall consist of the [State's executive] officers," namely, the Governor, Lieutenant Governor, Secretary of State, Auditor, Treasurer, Superintendent of Public Instruction, Attorney General, Commissioner of Agriculture, Commissioner of Labor, and Commissioner of Insurance. N.C. Const. art. III, § 8; *see also id.* art. III, §§ 2, 7. The constitution further provides, in general terms, for the creation of "administrative departments" as part of the State's executive branch. *Id.* art. III, § 11. Whereas each administrative department focuses on a discrete area of expertise, *see, e.g.*, N.C.G.S. § 143B-137.1 (2009) (setting forth the duties of the Department of Health and Human Services "to provide the necessary management, development of policy, and establishment and enforcement of standards for the provisions of services in the fields of public and mental health and rehabilitation"), the Council of State advises the Governor and approves certain actions taken by other agencies, *see, e.g., id.* § 53-77 (2009) (The Council advises the Governor regarding the establishment of banking holidays.); *id.* § 146-27 (2009) (The Department of Administration must "ma[k]e" "[e]very sale, lease, rental, or gift of land owned by the State," and such action must be "approved by" the Council.). Therefore, although the Council is defined as an executive agency, its constitutional creation, composition, purpose, and functions set it apart from agencies created and defined by statute.

This Court explicitly has recognized the complexity of governing in the administrative state. *Adams v. N.C. Dep't of Natural & Econ. Res.*, 295 N.C. 683, 249 S.E.2d 402 (1978). Although this Court noted in *Adams* that " 'the legislature may not abdicate its power to make

laws [or] delegate its *supreme* legislative power to any . . . coordinate branch or to any agency which it may create,' " *id.* at 696, 249 S.E.2d at 410 (quoting *N.C. Tpk. Auth. v. Pine Island, Inc.*, 265 N.C. 109, 114, 143 S.E.2d 319, 323 (1965) (alterations in original)), we also concluded that "strict adherence to ideal notions of the non-delegation doctrine would unduly hamper the General Assembly in the exercise of its constitutionally vested powers," *id.* at 696-97, 249 S.E.2d at 410 (citations omitted). These observations were made during the infancy of the APA, which initially went into effect in North Carolina in 1975, but they continue to hold true today so long as the "adequate guiding standards" mandated by *Adams* are put in place. *Id.* at 697, 249 S.E.2d at 410. Here, the mandate set forth explicitly in section 15-188 of the North Carolina General Statutes, coupled with guidance from the APA and the Council's own administrative rules is sufficient to satisfy the requirement that "adequate guiding standards" be put in place to govern the Council's actions.

According to our legislature, the purpose of the APA is to "establish[] a uniform system of administrative rule making and adjudicatory procedures for agencies." N.C.G.S. § 150B-1(a) (2009). However, the APA expressly exempts several agencies from its rule-making procedures, including "[t]he Department of Correction, with respect to matters relating solely to persons in its custody or under its supervision, including prisoners, probationers, and parolees." *Id.* § 150B-1(d)(6) (2009). The APA also fully exempts the DOC with respect to contested case proceedings. *Id.* § 150B-1(e)(7) (2009) ("The contested case provisions of this Chapter apply to all agencies and all proceedings not expressly exempted from the Chapter. The contested case provisions of this Chapter do not apply to . . . [t]he Department of Correction."). In contrast, although the APA designates the Council of State as an "agency," *id.* § 150B-2(1a) (2009) (" 'Agency' means an agency or an officer in the executive branch of the government of this State and includes the Council of State, the Governor's Office, a board, a commission, a department, a division, a council, and any other unit of government in the executive branch. A local unit of government is not an agency."), the Council is not expressly exempted from any of the APA's provisions, *id.* § 150B-1.

Although the issue before us is one of first impression in North Carolina, other states have addressed whether a lethal injection protocol created by agencies analogous to the DOC is subject to their APAs. While their decisions are not binding upon this Court, *see*

*Carolina Power & Light Co. v. Emp't Sec. Comm'n*, 363 N.C. 562, 569, 681 S.E.2d 776, 780 (2009), these decisions are instructive.

A number of state courts have held that their APA applies to the adoption of such protocols. *See Morales v. Cal. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 729, 741, 85 Cal. Rptr. 3d 724, 733 (2008) ("The procedural requirements designated by the APA for administrative regulations are applicable to [the lethal injection protocol]. Appellants' failure to comply with them invalidates the challenged protocol."); *Bowling v. Ky. Dep't of Corr.*, 301 S.W.3d 478, 489-90 (Ky. 2009) ("[T]he lethal injection protocol is not an issue 'purely of concern' to the Department [of Corrections] and its staff. Nor is there any basis for concluding that the Kentucky General Assembly intended for the Department to be able to modify at will, without any oversight, the manner in which the Commonwealth's most serious punishment is meted out."); *Evans v. State*, 396 Md. 256, 349-50, 914 A.2d 25, 80 (2006) (holding that "those aspects of the [protocol] that direct the manner of executing the death sentence—the Lethal Injection Checklist—constitute regulations . . . and, because they were not adopted in conformance with the requirements of the APA, are ineffective and may not be used until such time as they are properly adopted"), *cert. denied*, 552 U.S. 835, 169 L. Ed. 2d 53 (2007).

In other states in which the APA includes an exemption similar to this State's DOC exemption "with respect to matters relating solely to persons in its custody or under its supervision, including prisoners, probationers, and parolees," N.C.G.S. § 150B-1(d)(6), courts have held that the APA does not apply to the protocols adopted. *See Middleton v. Mo. Dep't of Corr.*, 278 S.W.3d 193, 197 (Mo.) (holding that the legislature intended "that execution protocols would not be subject to rulemaking" and that "merely because an event or topic is interesting or important does not make it subject to rulemaking given that there is a specific statutory exemption, 'concerning only inmates' "), *cert. denied*, —— U.S. ——, 173 L. Ed. 2d 1331 (2009); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 311-12 (Tenn. 2005) ("[T]he lethal injection protocol is not a rule as defined by the UAPA. The protocol instead fits squarely within two exceptions to the meaning of 'rule': statements concerning only the internal management of state government and not affecting private rights privileges or procedures available to the public, and statements concerning inmates of a correctional or detention facility." (internal citations omitted)), *cert. denied*, 547 U.S. 1147, 164 L. Ed. 2d 813 (2006); *Porter v. Commonwealth*, 276 Va. 203, 239, 661 S.E.2d 415, 432–33 (2008)

(holding that the Virginia APA "exempts actions of agencies relating to '[i]nmates of prisons or other such facilities or parolees therefrom,' " that "the Virginia Department of Corrections is an agency whose sole purpose is related to inmates of prisons," and that the Department "is thus exempt from the strictures of the APA" (internal citation omitted)), *cert. denied*, —— U.S. ——, 173 L. Ed. 2d 1097 (2009). In the case *sub judice*, neither party disputes that the DOC's APA exemption "with respect to matters relating solely to persons in its custody or under its supervision," N.C.G.S. § 150B-1(d)(6), applies to the lethal injection protocol. Instead, their arguments center on whether the APA applies to the Council's role in approving the protocol.

Petitioners argue that, because the Council of State is defined as an "agency" in the APA and because it lacks an express exemption from Chapter 150B, the Council's approval of another agency's actions still must conform to the broad, overall requirements set forth in the APA. However, the Council contends that the North Carolina Administrative Code directs the Council to employ the same hearing procedures that apply to the promulgating agency when the Council reviews actions taken by that agency and that a contrary decision by this Court would eviscerate the legislature's intent to exempt the DOC from the requirements of the APA in this circumstance.

Specifically, the parties disagree as to the correct interpretation of one of the Council's own rules that addresses this issue. The North Carolina Administrative Code provides in relevant part:

> In those instances where the Council of State must approve a rule adopted by an executive department or when it adopts a rule itself, proposed text for the rule must be submitted to the Council for review beforehand. The proposed text shall be submitted by the executive department responsible for administering the statute to which the proposed rule relates. The executive department must follow Chapter 150B of the General Statutes on rulemaking [the APA] before submitting its recommendation to the Council. *The hearing procedures applicable to that executive department apply.* The Council may initiate rule-making in those matters which require its approval.

6 NCAC 2 .0001 (June 2010) (emphasis added). Petitioners' contention—that the statement that "[t]he hearing procedures applicable to that executive department apply" relates only to the sentence

immediately preceding it—simply reiterates that the executive department that submits the proposed rule must adhere to the APA. That interpretation does not answer the question before us and, essentially, renders the sentence meaningless. Notably, the earliest version of this rule, adopted in 1976, does appear to have given the Council more latitude in the rule-making process. At that time, the rule read:

> Prior to consideration of rules or regulations by the Council of State, the executive department vested by statute with responsibility for administering the statutes to which the rules relate shall prepare proposed rules or amendments to existing rules for recommendation to the council. Before presentation of the proposed rules or regulations to the council, the responsible executive branch department shall, according to its administrative procedures adopted pursuant to the North Carolina Administrative Procedure Act, give proper notice of proposed rule-making and provide an opportunity for interested parties to present opinions and positions on the proposed rules. *The council reserves the right to initiate consideration of rules and regulations and amendments to the same.*

*Id.* 2. 0001 (Feb. 1976) (emphasis added). Although this earliest version of the rule governing the Council's conduct does not align perfectly with today's version, this antecedent shows plainly how the Council once might have been called upon to take a more active role in the rule-making process instead of the more limited role it plays today.

The Council's own argument does comport with this analysis. As noted above, the critical phrase in the Administrative Code relates to which hearing procedures apply to the Council's review of the protocol. The Council argues that the controlling sentence relates to the Council's approval process and that the Council is exempt from the requirements of the APA when the promulgating executive department is exempt. As we discuss below, based upon the treatment of the Council in prior case law, we agree with the Council's position regarding its role in the approval process.

*Martin v. Thornburg*, 320 N.C. 533, 359 S.E.2d 472 (1987), is most instructive on this point. In that case, the Department of Administration had received bids for a building to be leased by the State and occupied by the Employment Security Commission. *Id.* at 536, 359 S.E.2d at 474. The Department then had submitted the lowest bid to

the Council of State for approval, in accordance with the applicable statutes. *Id.* When the matter came before the Council of State, the Council disapproved the proposal submitted, discussed one of the other lease proposals with an agent of another bidder who was present at the meeting, and subsequently approved a motion to require the Department to renegotiate the proposal with that other bidder. 320 N.C. at 536-37, 359 S.E.2d at 474.

Similar to the statute we consider here, the statutes in *Martin* provided that "[e]very acquisition of land . . . shall be made by the Department of Administration and approved by the Governor and Council of State," N.C.G.S. § 146-22 (1983), and that "[a]ll lease and rental agreements entered into by the Department shall be promptly submitted to the Governor and Council of State for approval or disapproval," *id.* § 146-25 (1983). However, in contrast to section 15-188, the Court in *Martin* had the benefit of a specific directive to the Council, which stated: "In the event the lowest rental proposed is not presented to the Council of State, that body may require a statement of justification, and may examine all proposals." *Id.* § 146-25.1(c) (1983).

In *Martin*, the Court noted that the "statutes clearly indicate that it is the role of the Department of Administration to investigate and negotiate lease proposals on behalf of the State and where applicable to require and approve specifications for such proposals." 320 N.C. at 540, 359 S.E.2d at 476. The Court then held that, when the lowest bid was submitted to the Council, the Council's authority was limited to either approval or disapproval of that proposal. *Id.* at 540-41, 359 S.E.2d at 476. The Council's authority exceeded mere approval or disapproval only if the Department did not submit the lowest bid, and even then, its authority did not include "requir[ing] the Department of Administration to negotiate and enter any lease other than the lease proposed to [the Council] by the Department of Administration." *Id.* at 541, 359 S.E.2d at 476-77. The Court then reversed the trial court's order that "authoriz[ed] the Council of State to direct the Department of Administration to execute a lease." *Id.* at 548, 359 S.E.2d at 481.

Like the statute in *Martin*, the law here unmistakably places primary responsibility for the lethal injection protocol upon the promulgating agency, the DOC. The relevant statute provides, in part, that:

The superintendent of the State penitentiary shall also cause to be provided, in conformity with this Article and approved by the Governor and Council of State, the necessary appliances for the

infliction of the punishment of death and qualified personnel to set up and prepare the injection, administer the preinjections, insert the IV catheter, and to perform other tasks required for this procedure in accordance with the requirements of this Article.

N.C.G.S. § 15-188 (2009). The administrative head of the State penitentiary is the subject of this statute, and he is the one charged with ensuring that the protocol is drafted and instituted properly. It is clear that the General Assembly intended that the DOC have primary responsibility for the lethal injection process. As in *Martin*, the statute does not give the Council authority beyond merely approving or disapproving the submitted protocol. *Cf. State ex rel. Comm'r of Ins. v. N.C. Auto. Rate Admin. Office*, 292 N.C. 1, 11, 231 S.E.2d 867, 872 (1977) (concluding that, pursuant to the relevant statute, the Commissioner of Insurance "was authorized to approve the filing in toto, approve the filing in part, or disapprove the filing," but could not fix rates himself).

Our case law provides a clear view of the limited role that the General Assembly intends the Council of State to play when it requires the Council to approve an action taken by another state agency. *See id.* at 12, 231 S.E.2d at 873 ("We recognize that the provisions of G.S. 58-248 might have been written so as to give the Commissioner more authority as a rate-maker or so as to provide a more expeditious procedure in altering proposed rates. However, this Court cannot, under the guise of judicial interpretation, interpolate into the statute provisions which are wanting." (citations omitted)); *see also Lewis v. White*, 287 N.C. 625, 642, 216 S.E.2d 134, 145 (1975) ("The Legislature having given this wide discretion to the Art Museum Building Commission, subject only to the specified approvals[ by, *inter alia*, the Governor and the Council of State], the courts are not authorized to substitute their judgment for that of the Commission concerning the proper location of the Museum."), *superseded by statute, North Carolina Environmental Policy Act of 1971, N.C.G.S. § 113A-4, on other grounds, as recognized in Goldston v. State*, 361 N.C. 26, 31-32, 637 S.E.2d 876, 880 (2006). It is clear that the General Assembly did not intend to negate the express exemption that it provided to the DOC in the APA by including a requirement that the Council approve the lethal injection protocol. Although we may question the wisdom of permitting the DOC "to be able to modify at will, without any oversight, the manner in which the [State's] most serious punishment is meted out," *Bowling*, 301 S.W.3d at 489-90, that policy decision is within the province of the legisla-

ture, not the courts, *Bacon v. Lee*, 353 N.C. 696, 717, 549 S.E.2d 840, 854 ("The political question doctrine controls, essentially, when a question becomes 'not justiciable . . . because of the separation of powers provided by the Constitution.' 'The . . . doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.' " (alterations in original) (citation omitted)), *cert. denied*, 533 U.S. 975, 150 L. Ed. 2d 804 (2001). Accordingly, we hold that the process by which the Council approves or disapproves the DOC's lethal injection protocol is not subject to the APA, and petitioners cannot challenge it by going through the Office of Administrative Hearings through the APA. Instead, any issue petitioners have with the protocol rests with the General Court of Justice or the federal courts.

As part of their argument that the APA applies to their case, petitioners also contend that they are "persons aggrieved" within the meaning of the APA and that section 15-188 of the North Carolina General Statutes confers rights upon them. Because our holding that the Council's approval of the lethal injection protocol is not subject to the APA is dispositive of this issue, we do not address the remaining portions of petitioners' first argument.

## Declaratory Judgment Claim

[2] Petitioners' second contention is that the superior court erred by dismissing their declaratory judgment claim that the Council's approval of the execution protocol violated section 15-188 of the North Carolina General Statutes. Although petitioners correctly contend that dismissal of the claim was improper, we agree with the superior court's conclusion that petitioners' rights pursuant to section 15-188 "are limited to the obligation that [their] death[s] be by lethal injection, in a permanent death chamber in Raleigh, and carried out pursuant to an execution protocol approved by the Governor and the Council of State."

Section 1-254 of the North Carolina General Statutes provides, in relevant part, "Any person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." N.C.G.S. § 1-254 (2009). With respect to declaratory judgments, our General Assembly provided: "This Article is declared to be remedial,

its purpose is to settle and to afford relief from uncertainty and inse-curity with respect to rights, status, and other legal relations, and it is to be liberally construed and administered." *Id.* § 1-264 (2009).

For a declaratory judgment action to proceed, an actual contro-versy must exist between the parties. *Sharpe v. Park Newspapers of Lumberton, Inc.*, 317 N.C. 579, 583, 347 S.E.2d 25, 29 (1986) ("Although the North Carolina Declaratory Judgment Act .does not state specifically that an actual controversy between the parties is a jurisdictional prerequisite to an action thereunder, our case law does impose such a requirement." (citing *Gaston Bd. of Realtors, Inc. v. Harrison*, 311 N.C. 230, 234, 316 S.E.2d 59, 61 (1984))). "Although a declaratory judgment action must involve an actual controversy between the parties, plaintiffs are not required to allege or prove that a traditional cause of action exists against defendant[s] in order to establish an actual controversy." *Goldston*, 361 N.C. at 33, 637 S.E.2d at 881 (alteration in original) (quoting *Town of Emerald Isle v. State*, 320 N.C. 640, 646, 360 S.E.2d 756, 760 (1987)) (internal quotation marks omitted). "[A] declaratory judgment should issue (1) when [it] will serve a useful purpose in clarifying and settling the legal rela-tions at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceed-ing." *Id.* (first alteration in original) (quoting *Augur v. Augur*, 356 N.C. 582, 588, 573 S.E.2d 125, 130 (2002) (alteration in original) (cita-tion omitted)) (internal quotation marks omitted).

In other instances similar to this case, we have addressed ques-tions presented to us through declaratory judgment actions. *See N.C. Dep't of Corr.*, 363 N.C. at 199, 675 S.E.2d at 648 (An action for declaratory judgment was proper when the actions of the DOC and North Carolina Medical Board, "both seeking to fulfill their statutory duties, are in irreconcilable conflict."); *Martin*, 320 N.C. at 535, 359 S.E.2d at 473 (noting that "[p]laintiffs brought this declaratory judg-ment action to determine the rights and duties of the Governor and Council of State with respect to the entry of leases on behalf of the State" and answering the questions presented); *Jernigan v. State*, 279 N.C. 556, 559-61, 184 S.E.2d 259, 262-64 (1971) (converting a claim pursuant to the Post Conviction Act to a Declaratory Judgment Act claim because "the question of [a parole statute's] constitutionality is a matter of importance both to the public and to prisoners" and "[w]hen a plaintiff has a property interest which may be adversely affected by the enforcement of the criminal statute, he may maintain an action under the Declaratory Judgment Act to determine the valid-

ity of the statute in protection of his property rights." (citations omitted)). In addition, other states have dealt with this precise issue—the conflict between the DOC's responsibility to develop a lethal injection protocol and the rights of death row inmates that flow from the adoption of the protocol—by issuing a declaratory judgment. *See, e.g., Bowling,* 301 S.W.3d at 481 ("A declaratory judgment action is the appropriate means of challenging implementation of a defendant's death sentence . . . .").

As in the instant case, a declaratory judgment is proper when "[f]undamental rights are involved. Petitioner is entitled to know what effect the statute has upon his future." *Jernigan,* 279 N.C. at 562, 184 S.E.2d at 264. It is important to note that a motion to dismiss a declaratory judgment action should not be granted merely because the party seeking the declaration ultimately is incorrect in his interpretation of the statute at issue. As we previously have noted,

> "[w]here the plaintiff's pleading sets forth an actual or justiciable controversy, it is not subject to demurrer[4] since it sets forth a cause of action, even though the plaintiff may not be entitled to a favorable declaration on the facts stated in his complaint; that is, in passing on the demurrer, the court is not concerned with the question whether plaintiff is right in a controversy, but only with whether he is entitled to a declaration of rights with respect to the matters alleged."

*Woodard v. Carteret Cnty.,* 270 N.C. 55, 61, 153 S.E.2d 809, 813-14 (1967) (citation omitted).

Here, the parties have fundamental differences as to how this Court should interpret section 15-188. According to petitioners, "[t]he Council of State's approval of an execution protocol which does not definitively specify the appliances and personnel to be employed in executions violated N.C.G.S. § 15-188 and violated Petitioners' constitutional rights to due process." To construe section 15-188 either to require the Council's substantive review of the DOC's provision of "the necessary appliances" "and qualified personnel," or to give death row inmates procedural rights with respect to the Council's approval, would create new causes of action that petitioners could pursue.

---

4. A demurrer serves the same purpose as a motion to dismiss. *See Grant v. Emmco Ins. Co.,* 295 N.C. 39, 42, 243 S.E.2d 894, 897 (1978) ("A motion to dismiss for failure of the complaint to state a claim upon which relief can be granted is the equivalent of a demurrer under the old practice for failure of the complaint to state a cause of action." (citing *Sutton v. Duke,* 277 N.C. 94, 176 S.E.2d 161 (1970))).

However, the superior court's interpretation of the statute—that petitioners' rights "are limited to the obligation that [their] death[s] be by lethal injection, in a permanent death chamber in Raleigh, and carried out pursuant to an execution protocol approved by the Governor and the Council of State" and that no factual or legal authority "supports Petitioner[s'] claims of a due process right to participate in the approval process"—forecloses further review based upon the Council's process for approval of the protocol. Accordingly, a genuine controversy between the parties exists as to the proper construction of section 15-188, and a declaratory judgment would both "serve a useful purpose in clarifying and settling the legal relations at issue" and "terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding." *Goldston*, 361 N.C. at 33, 637 S.E.2d at 881 (quoting *Augur*, 356 N.C. at 588, 573 S.E.2d at 130) (internal quotation marks omitted).

The statute at issue here reads:

In accordance with G.S. 15-187, the mode of executing a death sentence must in every case be by administering to the convict or felon a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until the convict or felon is dead; and when any person, convict or felon shall be sentenced by any court of the State having competent jurisdiction to be so executed, the punishment shall only be inflicted within a permanent death chamber which the superintendent of the State penitentiary is hereby authorized and directed to provide within the walls of the North Carolina penitentiary at Raleigh, North Carolina. *The superintendent of the State penitentiary shall also cause to be provided, in conformity with this Article and approved by the Governor and Council of State, the necessary appliances for the infliction of the punishment of death and qualified personnel to set up and prepare the injection, administer the preinjections, insert the IV catheter, and to perform other tasks required for this procedure in accordance with the requirements of this Article.*

N.C.G.S. § 15-188 (emphasis added). The subject of petitioners' claim for declaratory judgment centers on the italicized portion of the statute and whether "[t]he Council of State's approval of an execution protocol which does not definitively specify the appliances and personnel to be employed in executions violated N.C.G.S. § 15-188." In other words, petitioners argue that section 15-188 requires the Council to conduct a substantive review of the protocol rather than

"[l]eaving those important decisions [with respect to specific appliances and personnel] to the discretion of the warden." However, as discussed previously, the General Assembly clearly has delegated primary responsibility for creating the execution protocol to the DOC. The General Assembly's requirement that the Council approve the protocol does not diminish DOC's authority. Furthermore, the plain language of section 15-188 mandates that the DOC "provide" both the "necessary appliances for the infliction of the punishment of death and qualified personnel" to perform the tasks involved. *Id.* § 15-188. The statute requires neither a step-by-step protocol nor a detailed description of the appliances or personnel to be used in order for the Council to give its approval. We decline to engraft onto the statute any requirements beyond what its plain language provides, and we see no indication that the Council is required, pursuant to section 15-188, to conduct a substantive review of the protocol.

We hold that, " 'even though the plaintiff [is not] entitled to a favorable declaration on the facts' " of this case, *Woodard*, 270 N.C. at 61, 153 S.E.2d at 813–14 (citation omitted), the superior court erred in dismissing the declaratory judgment claim because petitioners did present a genuine controversy. Nonetheless, we affirm the superior court's order as modified because the court correctly construed section 15-188 to mean that petitioners' rights "are limited to the obligation that [their] death[s] be by lethal injection, in a permanent death chamber in Raleigh, and carried out pursuant to an execution protocol approved by the Governor and the Council of State" and that no factual or legal authority "supports Petitioner[s'] claims of a due process right to participate in the approval process."

## Conclusion

Accordingly, we affirm the superior court's ruling that the APA does not apply to the Council of State's approval of the lethal injection protocol in accordance with section 15-188. We also affirm the superior court's ruling, as modified, that petitioners' rights pursuant to section 15-188 do not include the right to present evidence to the Council and that the Council's obligations pursuant to section 15-188 do not include a substantive review of the protocol before it is approved.

MODIFIED AND AFFIRMED.