CALABRIA, Judge.
 

 *391
 
 WidenI77 ("plaintiff") appeals from an order granting summary judgment in favor of the North Carolina Department of Transportation ("NCDOT"), I-77 Mobility Partners LLC ("Mobility"), and the State of North Carolina ("State") (collectively referred to as "defendants") and dismissing plaintiff's claims with prejudice. For the reasons stated herein, we affirm the order of the trial court.
 

 I.
 
 Background
 

 On 26 June 2014, NCDOT and Mobility, a Delaware limited liability company, entered into a comprehensive agreement (the "Comprehensive Agreement") for the I-77 HOT Lanes Project (the "Project"). The I-77 corridor is "one of the most congested corridors in the [S]tate" and the Project offered a "comprehensive congestion management solution for approximately [twenty-six] miles of the I-77 corridor through the use of HOV3+ policy and managed lanes and supports future expansion of transit." The Comprehensive Agreement was a product of the State's "desires to facilitate private sector investment and participation in the development of the State's transportation system via public-private partnership agreements[ ]" pursuant to
 
 N.C. Gen. Stat. § 136-18
 
 (39)
 
 et seq.
 
 ("the P3 Statute").
 

 The P3 Statute provides, in pertinent part, that the NCDOT is vested with the power to
 

 enter into partnership agreements with private entities, and authorized political subdivisions to finance, by tolls,
 
 *392
 
 contracts, and other financing methods authorized by law, the cost of acquiring, constructing, equipping, maintaining, and operating transportation infrastructure in this State, and to plan, design, develop, acquire, construct,
 
 *444
 
 equip, maintain, and operate transportation infrastructure in this State.
 

 N.C. Gen. Stat. § 136-18
 
 (39) (2015).
 

 Through the Comprehensive Agreement, NCDOT granted Mobility "the exclusive right, and [Mobility] accepts the obligation, to finance, develop, design, construct, operate and maintain the Project[.]" This included the exclusive right to impose tolls and incidental charges upon the users of the High Occupancy Toll ("HOT") lanes; to establish, modify, and adjust the rate of such tolls and incidental charges in accordance with law; and to enforce and collect the tolls and incidental charges from the users of the HOT lanes in accordance with the terms and conditions of the Comprehensive Agreement.
 

 On 20 January 2015, plaintiff filed a "Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief." Plaintiff sought a declaration as to the constitutionality of the P3 Statute and the Comprehensive Agreement between the NCDOT and Mobility. Plaintiff's arguments included the following,
 
 inter alia
 
 : the General Assembly unconstitutionally delegated authority to the NCDOT to set toll rates without adequate standards and safeguards for which to exercise that power, to contract with Mobility and allow an unlimited rate of return on investment, and to contract with Mobility and allow the NCDOT and the State to compensate Mobility for its tax liabilities; violation of taxing power; violation of the public purpose doctrine; violation of due process; contrary to public policy; lack of authority; illegal contract; and motion for preliminary and permanent injunction.
 

 On 9 March 2015, the trial court entered an order finding that plaintiff "ha[d] not shown a sufficient likelihood of success on the merits to justify granting a preliminary injunction" and denying plaintiff's motion for a preliminary injunction.
 

 On 15 June 2015, Mobility filed a motion for summary judgment. On 19 June 2015, the State and the NCDOT filed a motion for summary judgment. On 13 November 2015, plaintiff filed a motion for summary judgment.
 

 *393
 
 On 24 February 2016, the trial court entered an order concluding as follows:
 

 4. As to the Motions for Summary Judgment filed by each party, it should be noted that it is not within the province, function or duty of the Court to determine the desirability or wisdom of the legislation or the contract at issue. These policy decisions are within the purview of the legislature and the North Carolina Department of Transportation. The subject legislation is not unconstitutional as applied, nor is the contract unlawful.
 

 5. As to the Motions for Summary Judgment filed by each party, there is no genuine issue as to any material fact, that Defendants are entitled to a judgment as a matter of law, and that Plaintiff is not entitled to judgment as a matter of law.
 

 Accordingly, the trial court granted defendants' motions for summary judgment and denied plaintiff's motion for summary judgment. Plaintiff's claims were dismissed with prejudice.
 

 On 22 March 2016, plaintiff filed notice of appeal.
 

 II.
 
 Standard of Review
 

 "Our standard of review of an appeal from summary judgment is de novo[.]"
 
 In re Will of Jones
 
 ,
 
 362 N.C. 569
 
 , 573,
 
 669 S.E.2d 572
 
 , 576 (2008) (citation omitted). "In ruling on a motion for summary judgment the evidence is viewed in the light most favorable to the non-moving party."
 
 Hinson v. Hinson
 
 ,
 
 80 N.C.App. 561
 
 , 563,
 
 343 S.E.2d 266
 
 , 268 (1986) (citation omitted). Rule 56 of the North Carolina Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2015).
 

 The showing required for summary judgment may be accomplished by proving an essential element of the opposing party's claim does not exist, cannot be proven at
 
 *445
 
 trial, or would be barred by an affirmative defense ... or by showing through discovery that the opposing party
 
 *394
 
 cannot produce evidence to support an essential element of her claim[.]
 

 Dobson v. Harris
 
 ,
 
 352 N.C. 77
 
 , 83,
 
 530 S.E.2d 829
 
 , 835 (2000).
 

 III.
 
 Discussion
 

 On appeal, plaintiff argues that the trial court erred by: (A) concluding that the North Carolina General Assembly's delegation of power to the NCDOT and NCDOT's arrangement with Mobility did not constitute an unconstitutional delegation of power; (B) concluding that the expenditure by the NCDOT and the State served a public purpose and was constitutional under Article V, Section 2(1) of the North Carolina Constitution ; (C) concluding that the Comprehensive Agreement did not violate the Turnpike Statute; and (D) concluding that the North Carolina General Assembly did not unconstitutionally delegate its authority to tax to the NCDOT in violation of Article I, Section 8 and Article II, Section 23 of the North Carolina Constitution and the Due Process Clause of the United States Constitution. We address each argument in turn.
 

 A.
 
 Delegation of Power
 

 Plaintiff argues that the trial court erred by concluding that the General Assembly's delegation of power to the NCDOT and NCDOT's arrangement with Mobility did not constitute an unconstitutional delegation of power. Specifically, plaintiff contends that the General Assembly's delegation of power pursuant to the P3 Statute "features an absolute, unfettered, unlimited, unilateral and therefore unconstitutional delegation of authority to an agency and private company." Plaintiff maintains that the P3 Statute grants unto Mobility the absolute authority to set toll rates without any meaningful input or control by the NCDOT or General Assembly. We are not convinced by plaintiff's arguments.
 

 "It is well settled in this State that the courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional-but it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people."
 
 McIntyre v. Clarkson
 
 ,
 
 254 N.C. 510
 
 , 515,
 
 119 S.E.2d 888
 
 , 892 (1961) (citation omitted). "In passing upon the constitutionality of a legislative act it is not for this Court to judge its wisdom and expediency. These matters are the province of the General Assembly. Rather, it is the Court's duty to determine whether the legislative act in question exceeds constitutional limitation or prohibition."
 
 Adams v. N.C. Dep't of Natural & Econ. Res.
 
 ,
 
 295 N.C. 683
 
 , 690,
 
 249 S.E.2d 402
 
 , 406 (1978).
 

 *395
 
 In our determination of whether the P3 Statute violates the rule that the General Assembly cannot delegate its power to legislate, we are directed by
 
 Adams
 
 .
 

 Although this Court noted in
 
 Adams
 
 that the legislature may not abdicate its power to make laws [or] delegate its supreme legislative power to any ... coordinate branch or to any agency which it may create, we also concluded that strict adherence to ideal notions of the non-delegation doctrine would unduly hamper the General Assembly in the exercise of its constitutionally vested powers[.]
 

 Conner v. N.C. Council of State
 
 ,
 
 365 N.C. 242
 
 , 250-51,
 
 716 S.E.2d 836
 
 , 842 (2011) (citations and internal quotation marks omitted) (emphasis in original).
 

 [T]he constitutional inhibition against delegating legislative authority does not preclude the legislature from transferring adjudicative and rule-making powers to administrative bodies provided such transfers are accompanied by adequate guiding standards to govern the exercise of the delegated powers.
 

 ....
 

 In the search for adequate guiding standards the primary sources of legislative guidance are declarations by the General Assembly of the legislative goals and policies which an agency is to apply when exercising its delegated powers. We have noted that such declarations need be only as specific as the circumstances permit. When there is an obvious need for expertise
 
 *446
 
 in the achievement of legislative goals the General Assembly is not required to lay down a detailed agenda covering every conceivable problem which might arise in the implementation of the legislation. It is enough if general policies and standards have been articulated which are sufficient to provide direction to an administrative body possessing the expertise to adapt the legislative goals to varying circumstances.
 

 Additionally, in determining whether a particular delegation of authority is supported by adequate guiding standards it is permissible to consider whether the authority vested in the agency is subject to procedural safeguards. A key purpose of the adequate guiding standards test is to
 
 *396
 
 insure that the decision-making by the agency is not arbitrary and unreasoned.
 

 Adams
 
 ,
 
 295 N.C. at 697-98
 
 ,
 
 249 S.E.2d at 410-11
 
 (internal citations and quotation marks omitted).
 

 In the case
 
 sub judice,
 
 the P3 Statute provides as follows, in pertinent part:
 

 The said Department of Transportation is vested with the following powers:
 

 ....
 

 (39) To enter into partnership agreements with private entities ... to finance, by tolls, contracts, and other financing methods authorized by law, the cost of acquiring, constructing, equipping, maintaining, and operating transportation infrastructure in this State, and to plan, design, develop, acquire, construct, equip, maintain, and operate transportation infrastructure in this State. An agreement entered into under this subdivision requires the concurrence of the Board of Transportation. The Department shall report to the Chairs of the Joint Legislative Transportation Oversight Committee, the Chairs of the House of Representatives Appropriations Subcommittee on Transportation, and the Chairs of the Senate Appropriations Committee on the Department of Transportation, at the same time it notifies the Board of Transportation of any proposed agreement under this subdivision....
 

 ....
 

 (39a) a. The Department of Transportation ... may enter into up to three agreements with a private entity as provided under subdivision (39) of this section for which the provisions of this section apply.
 

 b. A private entity or its contractors must provide performance and payment security in the form and in the amount determined by the Department of Transportation....
 

 ....
 

 d. Article 6H of Chapter 136 of the General Statutes shall apply to the Department of Transportation
 
 *397
 
 and to projects undertaken by the Department of Transportation under subdivision (39) of this section. The Department may assign its authority under [Article 6H of Chapter 136 of the General Statutes] to fix, revise, charge, retain, enforce, and collect tolls and fees to the private entity.
 

 e. Any contract under this subdivision or under Article 6H of this Chapter for the development, construction, maintenance, or operation of a project shall provide for revenue sharing, if applicable, between the private party and the Department, and revenues derived from such project may be used as set forth in G.S. 136-89.188(a), notwithstanding the provisions of G.S. 136-89.188(d)....
 

 ....
 

 f. Agreements entered into under this subdivision shall comply with the following additional provisions:
 

 1. The Department shall solicit proposals for agreements.
 

 2. Agreement shall be limited to no more than 50 years from the date of the beginning of operations on the toll facility.
 

 3. Notwithstanding the provisions of G.S. 136-89.183(a)(5), all initial tolls or fees to be charged by a private entity shall be reviewed by the Turnpike Authority Board. Prior to setting toll rates, either a set rate or a minimum and maximum rate set by the private entity, the private entity shall hold a public hearing on the toll rates, including an explanation of the toll setting methodology,
 
 *447
 
 in accordance with guidelines for the hearing developed by the Department. After tolls go into effect, the private entity shall report to the Turnpike Authority Board 30 days prior to any increase in toll rates or change in the toll setting methodology by the private entity from the previous toll rates or toll setting methodology last reported to the Turnpike Authority Board.
 

 ....
 

 *398
 
 6. The Turnpike Authority annual report under G.S. 136-89.193 shall include reporting on all revenue collections associated with projects subject to this subdivision under the Turnpike Authority.
 

 7. The Department shall develop standards for entering into comprehensive agreements with private entities under the authority of this subdivision and report those standards to the Joint Legislative Transportation Oversight Committee on or before October 1, 2013.
 

 N.C. Gen. Stat. §§ 136-18
 
 (39), (39a)(a)-(b), (39a)(d)-(e), and (39a)(f) (2015).
 

 Guided by the principles stated in
 
 Adams
 
 , we hold that the legislative goals and policies set forth in the P3 Statute, combined with its procedural safeguards, are sufficient to withstand a constitutional challenge.
 

 We are mindful that "there [exists] a strong presumption that enactments of the General Assembly are constitutional."
 
 Town of Spruce Pine v. Avery County
 
 ,
 
 346 N.C. 787
 
 , 792,
 
 488 S.E.2d 144
 
 , 147 (1997).
 

 The General Assembly has provided that it is the policy that:
 

 [t]he [NCDOT] shall develop and maintain a statewide system of roads, highways, and other transportation systems commensurate with the needs of the State as a whole and it shall not sacrifice the general statewide interest to the purely local desires of any particular area.
 

 N.C. Gen. Stat. § 136-44.1
 
 (2015). Article 6H of Chapter 136 of the General Statutes, applied to the NCDOT and to projects undertaken by the NCDOT under the P3 Statute pursuant to
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(d), states that:
 

 The General Assembly finds that the existing State road system is becoming increasingly congested and overburdened with traffic in many areas of the State; that the sharp surge of vehicle miles traveled is overwhelming the State's ability to build and pay for adequate road improvements; and that an adequate answer to this challenge will require the State to be innovative and utilize several new approaches to transportation improvements in North Carolina.
 

 *399
 
 Toll funding of highway and bridge construction is feasible in North Carolina and can contribute to addressing the critical transportation needs of the State. A toll program can speed the implementation of needed transportation improvements by funding some projects with tolls.
 

 N.C. Gen. Stat. § 136-89.180
 
 (2015).
 

 It is clear that achievement of this stated legislative policy and the fixing, revising, charging, retaining, enforcing, and collecting of tolls require expertise. It would be impractical to require the General Assembly to provide a "detailed agenda covering every conceivable problem which might arise in the implementation of the legislation."
 
 Adams
 
 ,
 
 295 N.C. at 698
 
 ,
 
 249 S.E.2d at
 
 411 ;
 
 see
 

 Bring v. North Carolina State Bar
 
 ,
 
 348 N.C. 655
 
 , 659,
 
 501 S.E.2d 907
 
 , 910 (1998) (stating that "[i]t is not practical for the General Assembly to micromanage the making of rules for the Board [of Law Examiners] such as what law schools are to be approved. The directions given by the legislature are as specific as the circumstances require"). Our Supreme Court has previously stated that "[a]s a practical matter tolls require little legislative regulation. If they are unreasonably high, motorists will boycott the turnpike; if they are unreasonably low, the bondholders will register their objections in some appropriate manner."
 
 N.C. Turnpike Authority v. Pine Island, Inc.
 
 ,
 
 265 N.C. 109
 
 , 115,
 
 143 S.E.2d 319
 
 , 324 (1965).
 

 Here, the General Assembly has enacted specific guiding standards within the P3 Statute to govern the NCDOT's exercise of the
 
 *448
 
 delegated powers. For example, the following standards,
 
 inter alia
 
 , exist to provide direction to the NCDOT for the Project: the NCDOT may assign its authority to fix, revise, charge, retain, enforce, and collect tolls and fees to the private entity under
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(d) ; the private entity or its contractors must provide performance and payment security in the form and in the amount determined by the NCDOT under
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(b) ; any contract under the P3 Statute shall provide for revenue sharing, if applicable, between the private party and the NCDOT pursuant to
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(e) ; the NCDOT must solicit proposals for agreements under
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(f)(1) ; the agreement shall be limited to no more than fifty years under
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(f)(2) ; and the NCDOT shall develop standards for entering into comprehensive agreements with private entities under the P3 Statute and report those standards to the Joint Legislative Transportation Oversight Committee pursuant to
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(f)(7). Considering the preceding guidelines, we hold that the directions given by the General Assembly are as specific as the circumstances require.
 
 *400
 
 Furthermore, we hold that there are adequate procedural safeguards in the P3 Statute to ensure adherence to the legislative standards.
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(f)(3) provides that all initial tolls or fees to be charged by a private entity shall be reviewed by the Turnpike Authority Board. Prior to setting toll rates, the private entity must hold a public hearing on the toll rates, including an explanation of the toll setting methodology, in accordance with hearing guidelines developed by the NCDOT.
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(f)(3). After the tolls go into effect, Mobility must report to the Turnpike Authority Board thirty days prior to any increase in toll rates or change in the toll setting methodology from the previous toll rates or toll setting methodology last reported to the Turnpike Authority Board.
 

 Id.
 

 N.C. Gen. Stat. § 136-18
 
 (39a)(f)(5) also states that sixty days prior to the signing of a concession agreement subject to the P3 Statute, the NCDOT must report to the Joint Legislative Oversight Committee, providing such things as a description of the project, number of years the tolls will be in place, and demonstrated ability of the project team to deliver the project.
 
 N.C. Gen. Stat. § 136-18
 
 (39a)(f)(5). These procedural safeguards,
 
 inter alia
 
 , ensure that the NCDOT carries out the Project consistent with the policies of the General Assembly.
 

 Based on the foregoing, we conclude that there are adequate guiding standards and procedural safeguards in place to regulate the exercise of authority for this Project. Accordingly, we hold that the trial court did not err by concluding that the General Assembly's delegation of power to the NCDOT constituted a constitutional delegation of power.
 

 B.
 
 Public Purpose
 

 Plaintiff's second argument on appeal is that the trial court erred by concluding that the Project's expenditures constituted a public purpose pursuant to Article V, Section 2(1) of the North Carolina Constitution. Plaintiff relies on the holding in
 
 Foster v. North Carolina Medical Care Commission
 
 ,
 
 283 N.C. 110
 
 ,
 
 195 S.E.2d 517
 
 (1973), for his contentions.
 

 Article V, Section 2(1) of the North Carolina Constitution provides that "[t]he power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away. Although the constitutional language speaks of the 'power of taxation,' the limitation has not been confined to government use of tax revenues."
 
 Madison Cablevision, Inc. v. City of Morganton,
 

 325 N.C. 634
 
 , 643,
 
 386 S.E.2d 200
 
 , 205 (1989).
 

 "The initial responsibility for determining what is and what is not a public purpose rests with the legislature; its determinations are entitled
 
 *401
 
 to great weight."
 
 Id.
 
 at 644-45,
 
 386 S.E.2d at 206
 
 . "[T]he presumption favors constitutionality. Reasonable doubt must be resolved in favor of the validity of the act."
 
 Maready v. City of Winston-Salem
 
 ,
 
 342 N.C. 708
 
 , 714,
 
 467 S.E.2d 615
 
 , 619 (1996) (citations omitted).
 

 The General Assembly's adoption of the P3 Statute leaves no doubt that our legislature
 
 *449
 
 has determined that the NCDOT's partnership agreements with private entities to finance the cost of acquiring, constructing, equipping, maintaining, and operating transportation infrastructure in this State is a public purpose within the meaning of Article V, Section 2(1) of the North Carolina Constitution. However, "[i]t is the duty and prerogative of this Court to make the ultimate determination of whether the activity or enterprise is for a purpose forbidden by the Constitution of the state."
 
 Madison Cablevision
 
 ,
 
 325 N.C. at 645
 
 ,
 
 386 S.E.2d at 206
 
 .
 

 Our Supreme Court has stated that:
 

 [a] slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions. As people are brought closer together in congested areas, the public welfare requires governmental operation of facilities which were once considered exclusively private enterprises and necessitates the expenditure of tax funds for purposes which, in an earlier day, were not classified as public. Often public and private interests are so co-mingled that it is difficult to determine which predominates. It is clear, however, that for a use to be public its benefits must be in common and not for particular persons, interests, or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity.
 

 Martin v. North Carolina Housing Corp.
 
 ,
 
 277 N.C. 29
 
 , 43,
 
 175 S.E.2d 665
 
 , 672-73 (1970) (internal citations and quotation marks omitted). Our Courts
 

 ha[ve] not specifically defined public purpose but rather ha[ve] expressly declined to confine public purpose by judicial definition[, leaving] each case to be determined by its own peculiar circumstances as from time to time it arises. Two guiding principles have been established for determining [whether a government expenditure] is for a public purpose: (1) it involves a reasonable connection with the convenience and necessity of the particular
 
 *402
 
 municipality, and (2) the activity benefits the public generally, as opposed to special interests or persons[.]
 

 Madison Cablevision
 
 ,
 
 325 N.C. at 646
 
 ,
 
 386 S.E.2d at 207
 
 (internal citations and quotation marks omitted). We apply these foregoing principles to the present case.
 

 As to the first prong of this test, "whether an activity is within the appropriate scope of governmental involvement and is reasonably related to communal needs may be evaluated by determining how similar the activity is to others which this Court has held to be within the permissible realm of governmental action."
 
 Maready
 
 ,
 
 342 N.C. at 722
 
 ,
 
 467 S.E.2d at 624
 
 .
 

 Numerous cases demonstrate the spectrum of facilities and activities which have been deemed to constitute a public purpose. Aid to railroad:
 
 Wood v. Commissioners of Oxford,
 

 97 N.C. 227
 
 ,
 
 2 S.E. 653
 
 (1887) ; Airport facilities:
 
 Greensboro-High Point Airport Auth. v. Johnson
 
 ,
 
 226 N.C. 1
 
 ,
 
 36 S.E.2d 803
 
 (1946) ; Port Terminal Facilities:
 
 Webb v. Port Comm'n of Morehead City
 
 ,
 
 205 N.C. 663
 
 ,
 
 172 S.E. 377
 
 (1934) ; Railway Terminal Facilities:
 
 Hudson v. City of Greensboro
 
 ,
 
 185 N.C. 502
 
 ,
 
 117 S.E. 629
 
 (1923) ; Air Cargo Facilities:
 
 Piedmont Triad Airport Auth. v. Urbine
 
 ,
 
 354 N.C. 336
 
 ,
 
 554 S.E.2d 331
 
 (2001). These cases establish that providing public transportation infrastructure has long been held to be within the permissible scope of governmental action.
 

 As to the second prong of the
 
 Madison Cablevision
 
 test,
 

 activities are considered constitutional so long as they
 
 primarily
 
 benefit the public and not a private party: It is not necessary, in order that a use may be regarded as public, that it should be for the use and benefit of every citizen in the community. Moreover, an expenditure does not lose its public purpose merely because it involves a private actor. Generally, if an act will promote the welfare of a state or a local government and its citizens, it is for a public purpose.
 

 Peacock v. Shinn
 
 ,
 
 139 N.C.App. 487
 
 , 493-94,
 
 533 S.E.2d 842
 
 , 847 (2000) (internal citations and quotation marks omitted) (emphasis in original).
 

 Keeping these principals in mind, the expenditure in the present case clearly
 
 *450
 
 serves a public purpose. The General Assembly recognized that the State's road system was becoming increasingly congested and overburdened with traffic. The legislature sought to alleviate the transportation needs of the State by authorizing the NCDOT to enter into
 
 *403
 
 agreements with private entities to finance transportation infrastructure in this State pursuant to the P3 Statute. The expenditure the P3 Statute authorizes should "provide immediate travel time reliability along I-77 from Uptown Charlotte to the Lake Norman area[,]" a stated purpose of the Project. Although Mobility will finance, construct, operate, and maintain the Project, gaining incidental private benefit, the government expenditure primarily benefits the public. Mobility's involvement as a private actor and the possibility that not every citizen in the community may use the Project's toll lanes do not negate the public purpose of the expenditure.
 

 Plaintiff cites to the holding in
 
 Foster
 
 and argues that the facts before us are "more constitutionally troubling[.]" In
 
 Foster
 
 , the North Carolina Medical Care Commission Hospital Facilities Act, enacted in 1971 and found in
 
 N.C. Gen. Stat. §§ 131-138
 
 to 131-162, was challenged.
 
 Foster,
 

 283 N.C. at 113-14
 
 ,
 
 195 S.E.2d at 520
 
 . The act in question vested in the North Carolina Medical Care Commission the authority to effectuate a plan to issue revenue bonds to finance construction of public and private hospital facilities.
 
 Id.
 
 at 115-16,
 
 195 S.E.2d at 521-22
 
 . The
 
 Foster
 
 Court noted that while it was "well settled that the expenditure of tax funds for the construction of a hospital, to be owned and operated by the State, a county, a city, town or other political subdivision of the State, is an expenditure for a public purpose[,]" it also recognized that "[i]t does not necessarily follow ... that the construction and operation of the privately owned hospital is for a public purpose, within the meaning of the constitutional limitation upon the use of tax funds."
 
 Id.
 
 at 125,
 
 195 S.E.2d at 527
 
 . The Court reasoned that "[w]hile the Act now before us provides for ownership of the acquired property by a public agency until the bonds issued to finance the contemplated construction are retired, the Act has no purpose separate and apart from the operation by and ultimate conveyance of the hospital facility to the lessee thereof."
 
 Id.
 
 at 127,
 
 195 S.E.2d at 528
 
 . Accordingly, the Court held that "the expenditure of public funds raised by taxation to finance, or facilitate the financing of, the construction of a hospital facility to be privately operated, managed and controlled is not an expenditure for a public purpose" and was prohibited by Article V, Section 2(1) of the North Carolina Constitution.
 
 Id.
 
 at 127,
 
 195 S.E.2d at 528-29
 
 .
 

 We find
 
 Foster
 
 distinguishable. In
 
 Foster
 
 , the North Carolina Supreme Court held that there was no purpose separate from the operation by and ultimate conveyance of the hospital facility to the lessee. Once the bonds were paid, the North Carolina Medical Care Commission was to convey title to such facility to the lessee, a private entity. Here, the Project is to
 
 *404
 
 provide travel time reliability and Mobility's private benefit is incidental to the public purpose. Under Article 2 of the Comprehensive Agreement, all of the infrastructure constructed by Mobility will be owned by the State. Mobility has "no fee title, leasehold estate, possessory interest, permit, easement or other real property interest of any kind in or to the Project or the Project Right of Way" and Mobility's property interests are "limited to contract rights constituting intangible personal property (and not real estate interests)." Furthermore, the Comprehensive Agreement limits Mobility's role in the Project to fifty years.
 

 For the reasons stated above, we hold that the trial court did not err by concluding that the Project's expenditures constituted a public purpose pursuant to Article V, Section 2(1) of the North Carolina Constitution.
 

 C.
 
 Turnpike Statute
 

 Plaintiff's third argument on appeal is that the trial court erred by failing to conclude that the Comprehensive Agreement violated the Turnpike Statute.
 

 First, plaintiff contends that Mobility's design plan for the Project violates
 
 N.C. Gen. Stat. § 136-89.199
 
 by reducing the number of existing non-toll general purpose lanes from four to three.
 

 *451
 

 N.C. Gen. Stat. § 136-89.199
 
 provides as follows:
 

 Notwithstanding any other provision of this Article, the Authority may designate one or more lanes of any highway, or portion thereof, within the State, including lanes that may previously have been designated as HOV lanes under G.S. 20-146.2, as high-occupancy toll (HOT) or other type of managed lanes; provided, however, that such designation
 
 shall not reduce the number of existing non-toll general purpose lanes
 
 . In making such designations, the Authority shall specify the high-occupancy requirement or other conditions for use of such lanes, which may include restricting vehicle types, access controls, or the payment of tolls for vehicles that do not meet the high-occupancy requirements or conditions for use.
 

 N.C. Gen. Stat. § 136-89.199
 
 (2015) (emphasis added).
 

 A review of the Comprehensive Agreement establishes that plaintiff's argument fails. The Comprehensive Agreement explicitly states that the Project will not reduce the number of existing non-toll general purpose lanes.
 

 *405
 
 Developer shall design and construct the Project to provide at a minimum the same number of Existing General Purpose Lanes within the Existing ROW as of the Proposal Due Date. Developer shall not eliminate, reduce the width of or otherwise permanently restrict access to existing ramps and loops.
 

 Next, plaintiff argues that the Comprehensive Agreement violates
 
 N.C. Gen. Stat. § 136-89.183
 
 (5) and is therefore void for illegality. Plaintiff contends that while
 
 N.C. Gen. Stat. § 136-89.183
 
 (5) requires review by the Board of Transportation, Joint Legislative Transportation Oversight Committee, and Joint Legislative Commission on Governmental Operations thirty days prior to the effective date of any toll or fee, the Comprehensive Agreement fails to require the same. Plaintiff's argument is misplaced.
 

 N.C. Gen. Stat. § 136-89.183
 
 (a)(5) gives the Turnpike Authority power "[t]o fix, revise, charge, retain, enforce, and collect tolls and fees for the use of Turnpike Projects" and requires that "[t]hirty days prior to the effective date of any toll or fee ... the Authority shall submit a description of the proposed toll or fee to the Board of Transportation, the Joint Legislative Transportation Oversight Committee and the Joint Legislative Commission on Governmental Operations for review." However,
 
 N.C. Gen. Stat. § 136-89.183
 
 (a)(5) is not applicable to this case. The P3 Statute unambiguously states that:
 

 Notwithstanding the provisions of G.S. 136-89.183(a)(5),
 
 all initial tolls or fees to be charged by a private entity shall be reviewed by the Turnpike Authority Board. Prior to setting toll rates, either a set rate or a minimum and maximum rate set by the private entity, the private entity shall hold a public hearing on the toll rates, including an explanation of the toll setting methodology, in accordance with guidelines for the hearing developed by the Department.
 

 N.C. Gen. Stat. § 136-18
 
 (39a)(f)(3) (emphasis added). Thus, while
 
 N.C. Gen. Stat. § 136-89.183
 
 (a)(5) may apply to some tolls of the North Carolina Turnpike Authority, it does not apply to the Project at issue in this case.
 

 Accordingly, we reject plaintiff's argument that the trial court erred by failing to conclude that the Comprehensive Agreement violated the Turnpike Statute.
 

 *406
 
 D.
 
 Authority to Tax
 

 In its last argument on appeal, plaintiff asserts that the trial court erred by failing to conclude that the General Assembly unconstitutionally delegated its authority to tax to the NCDOT, in violation of Article I, Section 8 and Article II, Section 23 of the North Carolina Constitution and the Due Process Clause of the United States Constitution. Specifically, plaintiff argues that while the North Carolina Constitution "forbids the delegation by the General Assembly to a non-elected body the power to impose or forgive taxes[,]" the legislature has granted unto Mobility the authority to impose and collect taxes. Furthermore, plaintiff contends that it was "denied due process in the manner in which these tax liabilities were imposed upon it[.]"
 

 *452
 
 Plaintiff's entire argument is premised on an issue that has already been decided by our Supreme Court. In
 
 North Carolina Turnpike Authority
 
 , the Supreme Court stated that:
 

 Tolls are not taxes. A person uses a toll road at his option; if he does not use it, he pays no toll. Taxes are levied for the support of government, and their amount is regulated by its necessities. Tolls are the compensation for the use of another's property or improvements made, and their amount is determined by the cost of the property or improvements.
 

 North Carolina Turnpike Authority
 
 ,
 
 265 N.C. at 116-17
 
 ,
 
 143 S.E.2d at 325
 
 (citations and quotation marks omitted). Because tolls do not constitute a tax within the meaning of the Constitution, the limitations of Article I, Section 8 and Article II, Section 23 of the North Carolina Constitution do not apply and plaintiff's due process argument is similarly without merit.
 

 IV.
 
 Conclusion
 

 For the reasons stated above, we affirm the order of the trial court, granting summary judgment in favor of defendants.
 

 AFFIRMED.
 

 Judges McCULLOUGH and INMAN concur.
 

 Judge Douglas McCullough concurred in this opinion prior to 24 April 2017.